T.C. Memo. 2015-56

UNITED STATES TAX COURT

MINCHEM INTERNATIONAL, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JERRY J. SUN AND SUN NAM SUN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 3704-12, 3705-12.          Filed March 24, 2015.

George W. Connelly, Jr., William P. Cantrell, and Rita Renee Huey, for
petitioners.

David Q. Cao, Lewis A. Booth, II, and Carol Bingham McClure, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge: Petitioners in these consolidated cases seek redetermination
of respondent's determinations that Minchem International, Inc. (Minchem), a

[*2] corporation, and the owner of Minchem, Jerry J. Sun, and his wife, Sun Nam Sun, received income from transfers by foreign companies for the 2008 or 2009 tax year. Respondent sent Minchem a notice of deficiency determining deficiencies of $3,712,541 and $1,030,419 and fraud penalties under section 6663(a) of $2,784,405.75 and $772,814.25 for 2008 and 2009, respectively.[1] The notice of deficiency also includes alternative penalties under section 6662(a).

Respondent also sent Jerry J. Sun and Sun Nam Sun a notice of deficiency determining deficiencies of $3,389,720 and $570,218 and fraud penalties under section 6663(a) of $2,542,290 and $427,663.50 for 2008 and 2009, respectively. The notice of deficiency also included alternative penalties under section 6662(a). Respondent later conceded that the Suns are not liable for section 6663(a) penalties related to two items, a home equity loan interest deduction and travel and entertainment expenses that were paid by Minchem, but are liable for penalties under section 6662(a).

After concessions the issues remaining for decision are: (1) whether the Suns properly deducted an investment interest expense for interest paid on a loan secured by their residence for 2008 and 2009; (2) whether Minchem received

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*3]** income from the transfers by foreign companies for 2008 or 2009; (3)

whether the Suns received income from the transfers by foreign companies for

2008 or 2009; (4) whether Minchem is liable for penalties under section 6663(a)

or 6662; and (5) whether the Suns are liable for penalties under section 6663(a) or

6662.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of

facts and the attached exhibits are incorporated herein by this reference.

Petitioners Jerry J. Sun and Sun Nam Sun are husband and wife who have been

naturalized citizens since 1996 and resided in Texas at the time they filed their

petition.[3] Mr. Sun wholly owns Minchem, a corporation organized under

subchapter C with a principal place of business in Houston, Texas.

I. The Suns and Minchem

Mr. Sun came to the United States in 1986 for a position with an

international mineral trading company, and he is still in the same line of business.

---

[2]Respondent disallowed Minchem's business deductions for the Suns' travel and entertainment expenses of $156,689.50 and $214,693.37 for the 2008 and 2009 tax years, respectively. Petitioners concede respondent's adjustments. Petitioners also concede respondent's adjustments to the Suns' gambling income of $1,280,300 and $463,700 for 2008 and 2009, respectively.

[3]Mrs. Sun chose not to appear at trial. Only Mr. Sun testified.

**[*4]** He earned a college degree in English language and international trade from a Chinese university in 1984 and first moved to the United States as a sales representative for a Chinese-owned mineral trading company.

In 1993 Mr. Sun organized Minchem under the State laws of Texas and continues to be the sole shareholder. Minchem's primary business purpose is to import and distribute industrial minerals. Minchem purchases minerals from suppliers in China and imports the minerals into the United States. Minchem had seven employees during 2008 and 2009.

Mr. Sun has served as Minchem's CEO from the time of its organization until the present and received a salary of $450,000 in both 2008 and 2009. As Minchem's CEO in 2008 and 2009, Mr. Sun oversaw daily operations and was responsible for sales and employee hiring. Mr. Sun was the sole individual authorized to make purchases in excess of $1,000 on Minchem's behalf. Mr. Sun had assistants and advisers to help with his CEO duties. The additional help allowed him to spend only around four to five hours a day on his CEO duties for Minchem.

Mr. Sun also spent a significant amount of time on other investment opportunities. In 2008 and 2009 Mr. Sun owned 99% of Sun Investment, LLC

[*5] (Sun Investment).[4]  Mr. Sun, individually, and Sun Investment invested in various sectors such as commercial properties, daycare services, banking, and rental properties.  Sun Investment also invested in the stock market through its two trading accounts, one with Ameritrade and the other with E*Trade.  Mr. Sun was responsible for managing Sun Investment's stock investments.  Mr. Sun also personally held an online trading account with E*Trade.  He spent around five hours a day managing stock investments.[5]

In 2002 the Suns completed a cash purchase of a real estate lot and built a residence on that lot.  They did not borrow any money to finance the lot or construct the residence.

In 2003 the Suns borrowed $1,736,079 from a bank and used their residence to secure the debt.  The funds were transferred directly from the lending bank to Minchem's corporate account.  In 2006 Mr. Sun refinanced the loan for $2,501,934.84 and continued to use the residence to secure the debt.  In 2008 and 2009 the Suns paid interest of $173,343.49 and $157,835.86 on the loan,

---

[4]Mr. Sun was the managing member as well as the tax matters partner of Sun Investment.  The other 1% of Sun Investment is owned by a member who is not a party to these cases.

[5]It is not clear from the record whether Mr. Sun spent the five hours managing solely his personal investments, solely Sun Investment's investments, or some mix of the two.

[*6] respectively. The Suns allocated the interest expense between mortgage interest expense and investment interest expense on their 2008 and 2009 Schedules A, Itemized Deductions. For 2008 the Suns deducted $7,046 of the interest paid on the loan as home mortgage interest and carried the remaining $166,297.49 forward as investment interest, which they deducted for 2009. For 2009 the Suns deducted $60,000 of the interest paid on the loan as home mortgage interest and used the remaining $97,835.86 as an investment interest expense deduction.

## II. The Investment Strategy and Mr. Cheung's Foreign Companies

Mr. Sun met Bill Cheung through a mutual business friend in 1992 or 1993. Mr. Cheung is a resident of Hong Kong and is a Chinese citizen.

In 2008 and 2009 Mr. Cheung owned some portion of several shipping companies, some of which Minchem used to import minerals from China.[6] Specifically, Mr. Cheung claimed ownership of companies called Kingdom Shipping Company Limited, Able Glory Shipping Limited, Power Vast Limited, and Magic Way Company Limited. These companies were organized in foreign

---

[6]It is unclear whether Mr. Cheung owned all of the shipping companies or owned only a fraction of the companies during 2008 and 2009. It is also unclear under what authority or capacity Mr. Cheung operated the companies or authorized international wire transfers. Neither party addressed these issues.

[*7] jurisdictions, but they all operated out of Hong Kong.[7]  Mr. Cheung's shipping activities appeared to continue operating several of these companies at once, even though he may have intended each of these companies to act as the subsequent replacement for the former company.

Outside of his shipping companies, Mr. Cheung previously had a series of unsuccessful investments.  He had lost a significant amount of money and was looking for other ways to invest.

Through their business dealings Mr. Sun and Mr. Cheung had become friends.  In 2008 and 2009 Mr. Sun and Mr. Cheung would often communicate by telephone and sometimes through email.  When Mr. Sun traveled to China, he would see Mr. Cheung socially and Mr. Cheung would give him rides to and from the airport, and they would discuss his American investment opportunities.

---

[7]As discussed below, the parties agree that all of the bank transfers originated from bank accounts in Hong Kong appearing to belong to each of the named companies, but both respondent and petitioners submitted conflicting documents indicating in which jurisdictions the companies were organized. Petitioners submitted documents showing the companies are organized in Liberia, the British Virgin Islands, and Panama.  Respondent submitted documents showing companies, with the same or substantially similar names, are organized in Hong Kong.  Neither set of documents reflects Mr. Cheung as the owner of any of the entities. The country in which each company is organized is not pertinent to these cases; and the Court does not decide whether companies sharing the same name are the same company or where the companies are organized.

**[*8]** Mr. Cheung was impressed by Mr. Sun's diverse investments, and in 2006 the two gentlemen verbally agreed on an investment strategy for Mr. Cheung after discussing potential investment opportunities in the United States.

The only part of the arrangement that both Mr. Cheung and Mr. Sun consistently agreed on was the general structure of the investment. Mr. Cheung would transfer sums of money through his shipping companies' bank accounts to Mr. Sun, who would then invest the money in the United States. Mr. Cheung would decide how much money he wished to send, and Mr. Sun had discretion on which investments to pursue with Mr. Cheung's money.

The remaining terms of the verbal agreement were not memorialized and are unclear. Specifically, Mr. Sun and Mr. Cheung inconsistently described the investment term, the expected return, and enforcement provisions. Mr. Sun believed the term was a minimum of 5 years and did not give a maximum period, whereas Mr. Cheung believed the term was 7 to 10 years. The expected return is also unclear; Mr. Sun believed the return on investment would be a 50-50 split of the net profit with a minimum 10% gain annually, but the return might not be paid annually. Mr. Cheung believed the return would be 10% to 15%, but was

**[*9]** uncertain whether that return was annual or total.[8]  Further, Mr. Cheung was unsure whether he would take legal action against Mr. Sun if Mr. Sun failed to achieve the expected return on investment or repay the transferred amount.

III.  Transfers to Minchem and Minchem's Officer Loan Account

Around 2006 Minchem created an officer loan account solely for the benefit of Mr. Sun.  The officer loan account would be debited and the balance would be increased when funds were drawn by, or paid for the benefit of, Mr. Sun.  Conversely, the account would be credited and the balance would decrease when funds were paid to Minchem.  Minchem did not sign any contracts with Mr. Sun regarding the officer loan account, and he was not required to pay interest on any loans from Minchem.  Similarly, it does not appear that Minchem was required to pay interest on any loans from Mr. Sun.

Between March 26 and December 18, 2008, a Hong Kong bank account attributed to a company called Kingdom Shipping transferred $11,255,888 in nine different transactions to Minchem.[9]  The smallest transfer was $550,772 and the

---

[8]When first asked about the return, Mr. Cheung exclaimed that a 10%-15% return was "definitely" not annual because Mr. Sun "would not be able to achieve that", but when asked to clarify the return on investment he remarked:  "Of course that's annually".

[9]The Court does not decide whether the companies are the same companies
(continued...)

**[*10]** largest was $1,750,572. The only transfer instruction from Mr. Cheung was a letter accompanying the $550,772 transfer that indicates that $300,000 is "additional capital" but the whole $550,772 is a "gift from Mr. Cheung to Mr. Sun". Kingdom Shipping transferred all the money from an account in Hong Kong to Minchem's JPMorgan Chase Bank account in the United States.

Between September 30 and December 15, 2009, Hong Kong bank accounts attributed to companies called Able Glory and Power Vast transferred a total of $3,515,130 in four different transactions to Minchem. The smallest transfer was $628,125 and the largest was $1,028,125. The transferring company transferred the money from its respective account in Hong Kong to Minchem's JPMorgan Chase Bank account in the United States.

For accounting purposes Minchem reported most of the money transferred from Mr. Cheung's companies as credits in Mr. Sun's officer loan account. Specifically, in 2008 Minchem reported $10,430,828.51 of the transferred

---

[9](...continued)
as the Hong Kong registered companies or the companies organized elsewhere and notes only that all the wire transfers originated from Hong Kong accounts purporting to be owned by companies with the stated names. It is also unclear under what authority or capacity Mr. Cheung originated the wire transfers from Hong Kong to the U. S. bank account held by Minchem.

[*11] $11,255,888[10] as credits to the officer loan account and also credited the officer loan account for all $3,515,130 of the funds transferred in 2009.[11] Minchem treated the money as Mr. Sun's funds loaned to the company that would eventually be repaid to him or as return payments for money that Minchem had previously loaned to Mr. Sun. Minchem did not report the money as receipts or other income to Minchem because it was not tied to any service.

Minchem could, however, use the money in the officer loan account for its own business purposes. Minchem did in fact use some of the transfers to inflate its cashflow when seeking a line of credit. Minchem reported the funds transferred from Mr. Cheung's companies as an asset that was offset with an accompanying liability. Minchem's in-house accounting personnel believed that the higher assets, even if offset with an equal liability, looked better to a bank and

---

[10]The stipulation erroneously states the credited amount from Kingdom Shipping as $10,730,828.51. Minchem's financial ledger shows the actual amount was $10,430,828.51. The Court will disregard the stipulation as inconsistent with the financial ledger. See Rule 91(a); see also Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195-196 (1989). Further, the record does not show what happened to the $825,059.49 that was not reported in the officer loan account.

[11]Able Glory recalled $720,000 of the December 15, 2009, transfer. Minchem returned the amount on December 16, 2009. Thus, the net amount received by Minchem and credited to the officer loan account from Mr. Cheung's companies in 2009 was $2,795,130.

[*12] would help establish a line of credit. It took advantage of this principle by showing the transferred money was an asset and a liability on the balance sheets provided to a lender when applying for a line of credit.

Mr. Sun would occasionally direct money from other sources into the officer loan account, but the bulk of the credits were from Mr. Cheung's various foreign companies. In 2008 Minchem's officer loan account reflected $249,448.48 of credit that was not from Kingdom Shipping or repayment of an amount removed from the officer loan account.[12] In 2009 Minchem's loan account reflected $1,137,949.10 of credit that was not from one of Mr. Cheung's foreign companies or repayment of an amount removed from the officer loan account. In other words, 97.6% of the independent funds credited to Minchem's officer loan account in 2008 and 71% of the independent funds credited in 2009 were from credits from Mr. Cheung's foreign companies.

By at least January 2008 Mr. Sun began frequently using the officer loan account for personal expenses. Mr. Sun would either pay his personal expenses

---

[12]As discussed below, Mr. Sun made several advances to casinos from the officer loan account and some lesser portions of the advances were returned to the officer loan account and reported as credits or not returned at all. Similarly, on April 4, 2008, Mr. Sun loaned a friend $75,000, $20,000 of which was repaid and reported as a credit on November 14, 2008. These credits are not independent deposits and instead represent portions of amounts that were already credited to the officer loan account.

[*13] directly from the officer loan account or he would remove money and use it at his discretion.  For example, in 2008 Minchem paid $135,874.43 for home automation, $158,517.80 for a new Mercedes Benz, and $49,598.81 for personal real estate tax.  In total, Minchem's officer loan account was debited $4,116,414.43 in 2008 and $1,811,127.65 in 2009 for expenses that Mr. Sun identified as personal during his trial testimony.[13]

Some of the personal expenditures included gambling expenses.  In 2008 $4,800,100 was transferred to casinos from the officer loan account and $2,394,550 was returned.[14]  In 2009 $1 million was transferred to casinos and $1,300,000 was returned.[15]  Thus between 2008 and 2009 Mr. Sun transferred

---

[13]These sums include only the net amounts from Mr. Sun's transfers to casinos and personal loans.  Mr. Sun pointed to $3,150,053.50 of debits in 2008 and $114,695 of debits in 2009 for which he could not remember whether the related expenses were personal, investment, or business.

[14]In 2008 Minchem's officer loan account transferred money to the Wynn casino in the following amounts:  $500,000 on March 27, $1 million on June 4, $1 million on September 11, $100 on September 12, $1 million on November 25, and $1 million on December 26.  In 2008 the Wynn casino transferred money to Minchem's officer loan account in the following amounts:  $480,000 on April 4, $1 million on September 12, $806,000 on December 1, and $100 on December 31.  Minchem's officer loan account also transferred $300,000 to the MGM casino on November 24 and received back $108,450 from the MGM casino on December 1.

[15]In 2009 Minchem's officer loan account transferred $1 million to the Wynn casino on June 12.  Minchem's officer loan account received $1 million and

(continued...)

[*14] $5,800,100 from the officer loan account to casinos and received back

$3,694,550; i.e., over the two years in issue Mr. Sun lost $2,105,550 from

gambling from the officer loan account.[16]

Mr. Sun told Mr. Cheung about the gambling losses but still believed that

he would be able to earn the promised return on investment in spite of over $2

million in gambling losses. Although, Mr. Cheung was not sure whether the lost

money was money that he sent to Mr. Sun or Mr. Sun's personal money.

Mr. Sun did use some of the funds in the officer loan account for

investment. In 2008 Mr. Sun directed transfers of $304,411.22 to Sun Investment

and $2,900,000 to his personal E*Trade account. In 2009 Mr. Sun directed

transfers of $201,195.57 to Sun Investment, $363,962 to Tiger Partners LLC,

---

[15](...continued)
$300,000 from the Wynn casino on January 5 and June 23, respectively.

[16]Combining the 2008 and 2009 tax years better reflects Mr. Sun's gambling transactions because Mr. Sun advanced a casino $1 million on December 26, 2008, and $1 million was returned on January 5, 2009. Thus the debits in the officer loan account appear inflated for 2008 and the credits appear inflated for 2009 because these two transfers likely stem from the same transaction and result in a zero sum.

**[*15]** $352,085 to Subhouse Capital LLC, and $65,000 to Maddox Interests.[17]  Mr. Sun did not, however, distinguish whether the money was his or Mr. Cheung's money.

IV.  Additional Wire Transfers From Foreign Companies

In 2008 Mr. Cheung's foreign companies transferred a total of $1,599,977 directly to Mr. Sun's personal E*Trade account in two transactions:  the first on January 9, when Magic Way Company transferred $1,199,990, and the second on October 22, when Kingdom Shipping transferred $399,987.  Mr. Sun did not segregate the transfers in his personal E*Trade account.

In 2008 Mr. Cheung's foreign companies also transferred a total of $3,257,901 directly to Sun Investment.  Sun Investment received $558,567 on May 16 and $1,198,567 on October 20 from Magic Way Company.  Further, on October 8, Sun Investment received $1,500,767 from Kingdom Shipping.  In 2009 Sun Investment received $299,967 from a single transfer from Magic Way Company.

---

[17]Mr. Sun was a direct or indirect member for each of these partnership entities.

**[*16]** V.  Administrative Background

Neither Minchem, the Suns, nor the other related businesses reported money received from Mr. Cheung as income for the 2008 or 2009 tax year.  Respondent sent Minchem a notice of deficiency on January 4, 2012, for the 2008 and 2009 tax years, determining deficiencies and penalties under section 6663(a) for both tax years and, in the alternative, accuracy-related penalties under section 6662 for both tax years.  Respondent later conceded the penalties under section 6663(a) for the portions of the underpayments due to some items listed on Minchem's notice of deficiency but maintained that Minchem remained liable for section 6662(a) penalties as to those amounts.

Respondent also sent the Suns a notice of deficiency on January 4, 2012, for the 2008 and 2009 tax years, determining deficiencies and penalties under section 6663(a) for both Mr. and Mrs. Sun for both tax years and, in the alternative, accuracy-related penalties under section 6662(a) for both tax years.  Respondent later conceded the penalties under section 6663(a) for the portions of the underpayments due to some items listed on the Suns' notice of deficiency but maintained that the Suns remain liable for section 6662(a) penalties as to those amounts.

**[*17]** Minchem and the Suns timely filed separate petitions with the Court to challenge the notices of deficiency. The two cases were consolidated for purposes of trial, briefing, and opinion.

OPINION

The issues remaining to be decided are: (1) whether the Suns properly deducted an investment interest expense for interest paid on a loan secured by their residence for 2008 and 2009; (2) whether Minchem received income as gross receipts from the transfers from Mr. Cheung's foreign companies for 2008 or 2009; (3) whether the Suns received income as dividends or ordinary income from the transfers from Mr. Cheung's foreign companies for 2008 or 2009; (4) whether Minchem is liable for penalties under section 6663(a) or 6662 for 2008 or 2009; and (5) whether the Suns are liable for penalties under section 6663(a) or 6662 for 2008 or 2009.

## I. Home Equity Loan Interest

The Suns refinanced an outstanding loan for $2,501,935 through home equity indebtedness. For 2008 and 2009 the Suns allocated portions of the interest paid to mortgage interest and the remainder to investment interest expenses. A Form 1098, Mortgage Interest Statement, issued to the Suns for tax year 2008 showed they paid interest of $173,343.49. For 2008 the Suns deducted $7,046

[*18] paid toward the loan as home mortgage interest and carried $166,297.49 of

paid interest forward as investment interest, which they claimed for 2009.  A Form

1098 issued to the Suns for 2009 showed they paid interest of $157,835.86.  For

2009 the Suns claimed a deduction of $60,000 for the interest paid as home

mortgage interest and claimed the remaining interest as an investment interest

expense deduction.

The notice of deficiency denied the Suns' investment interest deduction in

its entirety and adjusted their home mortgage interest deduction.  The Suns assert

that an example in a temporary regulation is directly applicable and shows the

deduction is correct as claimed.  Respondent counters that the temporary

regulation does not apply because the Suns have not met its requirements.

Deductions are a matter of legislative grace, and taxpayers bear the burden

of establishing entitlement to any claimed deduction.  Rule 142(a); INDOPCO,

Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering,

292 U.S. 435, 440 (1934).[18]  This burden requires the taxpayer to substantiate

items relating to deductions claimed by keeping and producing adequate records

---

[18]Petitioners made an oral motion to shift the burden as to nonfraud issues. Under sec. 7491(a)(2) a taxpayer must comply with the requirements to substantiate any item.  As discussed below, petitioners did not substantiate the interest deduction.  Thus the burden does not shift under sec. 7491 with respect to the interest deduction.

**[*19]** that enable the Commissioner to determine the taxpayer's correct tax liability. Sec. 6001; <u>Hradesky v. Commissioner</u>, 65 T.C. 87, 89-90 (1975), <u>aff'd per curiam</u>, 540 F.2d 821 (5th Cir. 1976); <u>Meneguzzo v. Commissioner</u>, 43 T.C. 824, 831-832 (1965). A taxpayer claiming a deduction on a Federal income tax return must demonstrate that the deduction is allowable pursuant to some statutory provision and must further substantiate that the expense to which the deduction relates has been paid or incurred. <u>See</u> sec. 6001; <u>Hradesky v. Commissioner</u>, 65 T.C. at 89-90; sec. 1.6001-1(a), Income Tax Regs.

Section 163 allows taxpayers a deduction for "qualified residence interest" paid on the mortgage on their first or secondary home. Sec. 163(a), (h)(2)(D); sec. 1.163-10T(b), Temporary Income Tax Regs., 52 Fed. Reg. 48410 (Dec. 22, 1987). Qualified residence interest is either "acquisition indebtedness" or "home equity indebtedness." Sec. 163(h)(3)(A). Acquisition indebtedness is a loan of up to $1 million that is used to acquire, construct, or substantially improve a residence when that residence also secures the loan. Sec. 163(h)(3)(B). New debt to refinance old acquisition indebtedness is also acquisition indebtedness for purposes of section 163(h)(3)(A)(i) as long as it is not more than the refinanced debt. Sec. 163(h)(3)(B)(i). Home equity indebtedness is any other type of loan secured by a qualified residence but is capped at the lesser of $100,000 or the fair

[*20] market value of the residence minus any acquisition indebtedness on the residence. Sec. 163(h)(3)(C). There is a limit to qualified residence interest where the total average balances for the taxable year of all secured debts on a residence are more than the adjusted purchase price of the residence. Azimzadeh v. Commissioner, T.C. Memo. 2013-169; sec. 1.163-10T(c)(1), Temporary Income Tax Regs., 52 Fed. Reg. 48411 (Dec. 22, 1987). Further, if the sum of the average balances for the taxable year of all secured debts exceeds the adjusted purchase price of the qualified residence at the end of the taxable year, the taxpayer must use either the simplified method or the exact method to determine the amount of interest that is qualified residence interest. Sec. 1.163-10T(c)(1), Temporary Income Tax Regs., supra.

The two methods to determine the amount of qualified residence interest appear to treat excess paid interest differently. The simplified method treats remaining paid interest as nondeductible personal interest even if the remaining interest would be allocated under section 1.163-8T, Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987) to some other category of interest. Sec. 1.163-10T(d)(3), Temporary Income Tax Regs., 52 Fed. Reg. 48411 (Dec. 22, 1987). The exact method allows remaining interest to be allocated under section 1.163-8T, Temporary Income Tax Regs., supra, which makes remaining interest

**[*21]** potentially deductible. Sec. 1.163-10T(e)(4)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 48412 (Dec. 22, 1987).

The Suns point out that the example in section 1.163-10T(e)(4)(ii), Temporary Income Tax Regs., supra, appears to apply, but the Suns have failed to substantiate the deduction. Specifically, the Suns have not shown that the obtained funds were used for investing. In general, the nature of interest payments is determined not by the origin of the debt or the collateral that secures the loan but by the eventual use of the funds received as proceeds from the loan. Sec. 1.163-8T(a)(3), Temporary Income Tax Regs., supra.

The Suns contend that the interest paid is deductible as investment interest because the loan proceeds were deposited in Minchem's bank account. The Suns posit that Minchem is property held for investment because it is a type of property that generally produces dividend income. It is not necessary for the Court to decide whether Minchem is property held for investment because the Suns did not purchase or contribute the loan proceeds to Minchem. Instead, Minchem's general ledger notes that the company treated the mortgage proceeds as a personal loan from Mr. Sun to Minchem. In other words, Mr. Sun borrowed the money so that he could lend it to Minchem and Minchem would repay him. Mr. Sun has not shown that the funds disbursed for his mortgage to finance his ancillary loan to

[*22] Minchem were for investment. Further, the Suns fail to recognize the differences between the simplified method and the exact method--or explain the application of either.

The Suns have not demonstrated that the deduction is allowable pursuant to any statutory provision because they have not shown the funds were used for investing. Accordingly, respondent's determinations concerning the Suns' home mortgage and investment interest expense deduction for the interest paid on the home equity loan are sustained.

II. Burden of Proof for Unreported Income

In general, taxpayers bear the burden of disproving the Commissioner's determinations. Rule 142(a). Petitioners, however, contend that under Carson v. United States, 560 F.2d 693, 698 (5th Cir. 1977), in the Court of Appeals for the Fifth Circuit, to which an appeal of these cases would lie, the presumption of correctness does not attach in cases involving unreported income unless the Commissioner either identifies the taxable source of income or disproves nontaxable sources. See sec. 7482(b)(1)(A) and (B). Petitioners assert that respondent has not satisfied either of these requirements. Further, petitioners contend that the burden should shift under sections 7491 and 7522 for similar reasons. Respondent counters that he has sufficiently identified a likely source of

**[*23]** income as well as negating the nontaxable source. It is unnecessary for the Court to address the parties' disagreements and to determine whether the burden of proof has shifted for the unreported income because the outcome of each of the present cases is determined on the preponderance of the evidence. See Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir. 2005), aff'g T.C. Memo. 2003-212; Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005); Namyst v. Commissioner, T.C. Memo. 2004-263, aff'd, 435 F.3d 910 (8th Cir. 2006).

III. Transfers to Minchem

Before deciding on the tax consequences of the transfers between Mr. Cheung's foreign companies and Minchem, the Court needs to address the substance of the arrangement between Mr. Cheung and Mr. Sun. Respondent determined that the money from Mr. Cheung's foreign companies is either gross receipts to Minchem, which then made a distribution to Mr. Sun or, alternatively, represents direct income to Mr. Sun. Petitioners' position is less clear because while they often assert that Mr. Sun was entrusted to invest Mr. Cheung's money, they also appear to claim that the money was a loan to Mr. Sun.

A. Income to Minchem

Section 61(a) defines gross income as "all income from whatever source derived". A fundamental principle of income taxation is that income is taxable to

**[\*24]** the person who earns it. <u>Lucas v. Earl</u>, 281 U.S. 111, 114-115 (1930). The "true earner" of income is the person or entity who controls the earning of such income and not necessarily the person or entity that receives the income. <u>Barmes v. Commissioner</u>, T.C. Memo. 2001-155. The crucial question is "'whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes.'" <u>Id.</u>, slip op. at 78 (quoting <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 604 (1948)).

Minchem did not retain sufficient dominion and control over the funds transferred by Mr. Cheung's foreign companies to make it the recipient of the income for tax purposes. Minchem consistently reported money received from Mr. Cheung's foreign companies as either a loan from Mr. Sun to Minchem or as repayment for a loan from Minchem to Mr. Sun. Minchem's officer loan account records show that the funds "repaid" money spent on Mr. Sun's behalf. Similarly, when the funds from Mr. Cheung's foreign companies exceeded the debts to the officer loan account, the funds were treated as cash that Mr. Sun had loaned to Minchem, and that he could, and did, use the money for personal reasons. Further, when Minchem was applying for a line of credit, the money was shown as both an asset and a liability. In other words, Minchem recognized that it held the money

[*25] but had an obligation to repay it and could not exercise dominion and control over it.  See, e.g., Rutkin v. United States, 343 U.S. 130, 137 (1952); Arcia v. Commissioner, T.C. Memo. 1998-178.

Instead of retaining dominion and control over the funds, Minchem acted as a conduit for the money.  A taxpayer who merely acts as a conduit and disposes of transferred funds to third parties does not receive taxable income.  See Estate of Kalichuk v. Commissioner, T.C. Memo. 1964-336.  Minchem received the cash from Mr. Cheung's foreign companies but immediately treated it as belonging to a third party, Mr. Sun.  Rather than transferring the money to Mr. Sun, it either paid expenses on Mr. Sun's behalf or held the money in its officer loan account.  By holding the money in the officer loan account--which was solely for Mr. Sun's benefit--Minchem eliminated the need for Mr. Sun to turn around and loan the money back to the company on his behalf.

Accordingly, Minchem did not receive taxable income from Mr. Cheung's foreign companies because it did not retain sufficient dominion and control over the transferred funds.  See Barmes v. Commissioner, T.C. Memo. 2001-155. Further, Minchem did not receive taxable income from Mr. Cheung's foreign companies because Minchem acted as a conduit to Mr. Sun.  See Estate of Kalichuk v. Commissioner, T.C. Memo. 1964-336.

**[*26]** B.  Income to Mr. Sun

Respondent contends that the money transferred from Mr. Cheung's foreign companies is either qualified dividends from Minchem or income directly from the foreign companies.  As discussed above, Minchem was merely a conduit for the funds, and thus they are not qualified dividends to Mr. Sun.  Petitioners' position is that the funds transferred to Minchem are not income to Mr. Sun because he had an obligation to repay them.  In substance, petitioners contend the funds are a loan that Mr. Sun was obligated to repay.

Generally, the proceeds of a loan do not constitute income to a borrower because the benefit is offset by an obligation to repay.  United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967); Arlen v. Commissioner, 48 T.C. 640, 648-649 (1967).  Deciding whether a particular transaction constitutes a loan, however, is a question of fact to be determined upon consideration of all the pertinent facts in the case.  Fisher v. Commissioner, 54 T.C. 905, 909 (1970).

Whether a bona fide debtor-creditor relationship exists is a question of fact, and essential elements are the intent of the recipient of the funds to make monetary repayment and the intent of the person advancing the funds to enforce repayment. Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Fisher v. Commissioner, 54 T.C. at 909-910.  Whether the recipient had an intent to repay and the lender an intent

[*27] to enforce repayment is determined at the time of receipt of the funds. Frierdich v. Commissioner, 925 F.2d 180, 184 (7th Cir. 1991), aff'g T.C. Memo. 1989-103; Estate of Chism v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963), aff'g T.C. Memo. 1962-6.  Indicative of an intent to repay are that a note evidencing the indebtedness was executed, that the parties agreed on the rate of interest, that there was a fixed maturity date, that a security interest was given the creditor, and that the debtor had the ability to make repayment.  Frierdich v. Commissioner, 925 F.2d at 182; Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), aff'g T.C. Memo. 1983-98.

The funds that the Suns received from Mr. Cheung's foreign companies lacked many of the characteristics usually present when the Court finds that money advanced constitutes a bona fide loan.  For instance, at the time the Suns received the funds, a note evidencing the indebtedness was not executed and a security interest was not given.  Further, Mr. Sun and Mr. Cheung did not agree on the period of the loan or the rate of interest.  Mr. Sun believed the term was a minimum of 5 years and did not give a maximum period, whereas Mr. Cheung believed the term was 7 to 10 years.  Mr. Sun and Mr. Cheung also disagreed on the rate of return, or interest:  Mr. Sun believed the return on investment would be a 50-50 split of the net profit with a minimum 10% gain annually, but the return

[*28] might not be paid annually. Mr. Cheung believed the return would be between 10% and 15% but was uncertain whether that return was annual or total. In consideration of these factors, the transferred funds do not constitute a bona fide loan between Mr. Sun and Mr. Cheung.

Nor does any of the transfers--including the transfer accompanied by a letter--appear to be a gift, because Mr. Cheung lacked donative intent. A gift requires donative intent, actual delivery, and relinquishment of dominion and control. See Carrington v. Commissioner, 476 F.2d 704, 709 (5th Cir. 1973), aff'g T.C. Memo. 1971-222. The Supreme Court has defined a gift as a transfer of property that proceeds from a "'detached and disinterested generosity,'" "'out of affection, respect, admiration, charity or like impulses.'" Commissioner v. Duberstein, 363 U.S. 278, 285 (1960) (quoting Commissioner v. LoBue, 351 U.S. 243, 246 (1956), and Robertson v. United States, 343 U.S. 711, 714 (1952)). While the specific terms of the agreement between Mr. Cheung and Mr. Sun were not defined, both credibly testified that Mr. Sun was obligated to return some money to Mr. Cheung at some point. Thus, the transfers were not from detached and disinterested generosity because Mr. Cheung expected some return of money from Mr. Sun.

**[*29]** Further, Mr. Sun did not report the funds transferred by Mr. Cheung's foreign companies as gifts or otherwise show that he believed he was receiving gifts. Generally, section 6039F requires taxpayers to report large foreign gifts.[19] The Secretary requires taxpayers to file a Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts, to report aggregate gifts over $100,000 from foreign individuals and estates and $10,000, as adjusted for inflation, if the gift purportedly comes from a foreign corporation. Notice 97-34, 1997-1 C.B. 422; Announcement 98-30, 1998-1 C.B. 962. The transfers from Mr. Cheung's foreign companies exceed either of these thresholds in both tax years 2008 and 2009. The Suns did not file any Form 3520 in tax year 2008 or 2009. Accordingly, the transfers are not gifts because Mr. Cheung did not give the money out of detached and disinterested generosity and the Suns did not treat the money as gifts in the 2008 or 2009 tax year.

Instead it appears that Mr. Cheung's foreign companies entrusted the money to Mr. Sun for the specific purpose of having him invest the funds. State law determines the nature of property rights while Federal law determines the appropriate tax consequences of those rights. See United States v. Nat'l Bank of

---

[19]The sec. 6039F exception for certain organizations are not applicable in these cases.

[*30] Commerce, 472 U.S. 713, 722 (1985); Blanche v. Commissioner, T.C. Memo. 2001-63, aff'd, 33 Fed. Appx. 704 (5th Cir. 2002). Texas law recognizes that a trust may arise at the implication of an intention to create a trust. Mills v. Gray, 210 S.W.2d 985, 987 (Tex. 1948) (citing 54 Am. Jur. 22, sec. 5). It is not necessary that a formal trust be created in order to find that the property has been entrusted. Weingarten v. Commissioner, 38 T.C. 75, 79 (1962). Money a taxpayer receives in his or her capacity as a fiduciary or agent does not constitute income to that taxpayer. Heminway v. Commissioner, 44 T.C. 96, 101 (1965); Cedar Valley Bird Co., LLP v. Commissioner, T.C. Memo. 2013-153.

A transferee taxpayer does not receive income when the transferor and the transferee agree that money received is held in trust for the benefit of others. See Seven-Up Co. v. Commissioner, 14 T.C. 965, 977-978 (1950); Rogers v. Commissioner, T.C. Memo. 2011-277, aff'd, 728 F.3d 673 (7th Cir. 2013). Further, funds received in trust by a trustee are excludable from gross income when those funds are subject to a restriction that they be expended for a specific purpose and the taxpayer does not profit, gain, or benefit in spending the funds for the stated purpose. See Bailey v. Commissioner, T.C. Memo. 2012-96 (citing Ford Dealers Adver. Fund, Inc. v. Commissioner, 55 T.C. 761, 771 (1971), aff'd, 456 F.2d 255 (5th Cir. 1972)), aff'd, 2014 WL 1422580 (1st Cir. Mar. 14, 2014).

[*31] Mr. Sun and Mr. Cheung both credibly testified that Mr. Sun was to invest money on behalf of Mr. Cheung, and both agree that the funds transferred from Mr. Cheung's foreign companies to Minchem were specifically earmarked for investment purposes. Mr. Cheung, who was an unsuccessful investor, trusted Mr. Sun to invest the money and eventually to earn a profit from those investments. Mr. Sun credibly testified that Mr. Cheung did not put any restrictions on how the money was to be invested, but the money was designated for investment purposes. Accordingly, the transfers alone do not indicate the funds from Mr. Cheung's foreign companies are income to Mr. Sun because Mr. Sun held the money for Mr. Cheung's benefit. Specifically, Mr. Sun held the money on behalf of Mr. Cheung for investment purposes.

However, funds held in trust by a trustee generally become includible in his or her gross income once he or she misappropriates the money. Webb v. IRS, 15 F.3d 203, 207 (1st Cir. 1994); Adams v. Commissioner, T.C. Memo. 1970-104, aff'd, 456 F.2d 259 (9th Cir. 1972). Where a taxpayer misappropriates funds for the benefit of a related party or where he ultimately receives a benefit from the defalcation, he has received readily realizable economic value and has been enriched by it. Hobson v. Commissioner, T.C. Memo. 1992-312. Thus, a taxpayer must include in his or her gross income money that was misappropriated from

[*32] funds that were held for the benefit of others and used to confer a personal benefit. See id.

Whether funds have been misappropriated is a question of fact, but facts beyond "dominion and control" must be considered. See Bailey v. Commissioner, T.C. Memo. 2012-96. More specifically, an individual misappropriates funds when money has been entrusted to the individual for the sole purpose of investing and the individual instead uses the money for personal activities. DeGoff v. Commissioner, T.C. Memo. 1966-89.

As discussed above, Mr. Sun held money transferred by Mr. Cheung's foreign companies in trust for Mr. Cheung, and he misappropriated the funds because he exercised more than mere dominion and control over the money when he used it for personal purposes. In total, Mr. Sun identified $4,116,414.33 in the 2008 tax year and $1,811,127.65 in the 2009 tax year of personal expenses paid out of the funds transferred from Mr. Cheung's foreign companies.

Mr. Sun undisputedly treated as his own money held for Mr. Cheung's benefit and specifically earmarked for investment purposes. For example, Mr. Sun used some of the funds to purchase a personal automobile and a home automation system. Perhaps the most obvious example of Mr. Sun's misappropriation of the funds is his gambling activities. Mr. Sun transferred around $4,800,000 to casinos

[*33] in 2008 and lost around $2,405,450 of that money through his gambling activities that year.[20] Funds that are originally entrusted to an individual for investment purposes and are later used by that individual for gambling activities are considered misappropriated. See id. Accordingly, the funds from Mr. Cheung's foreign companies that Mr. Sun admittedly spent for personal purposes are gross income for the years in which he misappropriated the funds. See Webb, 15 F.3d at 207; Adams v. Commissioner, T.C. Memo. 1970-104.

Mr. Sun also misappropriated money that remained in the officer loan account that was used to inflate Minchem's cashflow when it was applying for a line of credit because the money benefited Mr. Sun. Mr. Sun chose to place the money Mr. Cheung's foreign companies transferred into Minchem's officer loan account. Mr. Sun had a choice of how to invest the money and he decided to leave several million of the foreign company funds in the officer loan account. Both Mr. Sun and Minchem considered the money as owned by Mr. Sun. In other words, Mr. Sun chose to let Minchem use the money as its own, in effect lending the money to Minchem. Minchem reported the money and offsetting liability when

---

[20]These amounts do not include two $100 transactions in tax year 2008. On September 12, $100 was debited from Minchem's officer loan account to Wynn casino, and on December 31, $100 was credited to the officer loan account by Wynn casino. Both transfers note that they are "Reverse Posted" funds.

**[*34]** applying for a loan account to show that the company could pay its large outstanding liabilities.[21] If Mr. Cheung's foreign companies had not sent the money, Mr. Sun would have had to loan Minchem his own money to achieve the same result.

Further, Mr. Sun did not use the money for the mutually agreed-upon purpose when he left the money in the officer loan account. Rather than pursuing investment opportunities--the action Mr. Cheung trusted Mr. Sun to perform--Mr. Sun left the money idle in the officer loan account. This deviation from the agreed-upon investment strategy amounts to a misappropriation of funds. Thus, loaning the money to his company goes beyond merely taking "dominion and control" and shows that Mr. Sun misappropriated the entrusted funds by placing the money in the officer loan account and not using it for its intended purpose. See DeGoff v. Commissioner, T.C. Memo. 1966-89.

Mr. Sun contends that he did invest some of the money Mr. Cheung's foreign companies transferred to Minchem; but the evidence shows that only a fraction of it was used for what might be called investment purposes, and all of it

---

[21]This is distinctly different from leaving the money in a third-party non-interest-earning account. The funds were not merely idle but used to effect a specific purpose chosen by Mr. Sun. Minchem and Mr. Sun would not have benefited from showing an increased cashflow if the money were deposited and left idle with a disinterested bank.

[*35] was commingled with Mr. Sun's personal money. Mr. Sun contends that in 2008 he used $3,204,411.22 out of the $10,430,828.51 transferred into Minchem's officer loan account for investment purposes, and in 2009 he used $982,242.57 out of the $2,795,103 transferred. Specifically, in 2008 Mr. Sun's personal E*Trade account received $2,900,000, and Sun Investment received $304,411.22 from Minchem's officer loan account. In 2009 Sun Investment received $201,195.57, Tiger Partnerships LLC received $363,962, Maddox Interests received $65,000, and Subhouse Capital LLC received $352,085 from Minchem's officer loan account.

All of the money transferred was commingled with Mr. Sun's other personal assets. The E*Trade account was his personally, and it held his money for personal investments. The money transferred from Minchem's officer loan account was not separated from Mr. Sun's money within the E*Trade account, and it is not clear whose money Mr. Sun was investing in any particular transaction. Similarly, Mr. Sun was a part owner of all the "investments". In other words, he was using the money from Mr. Cheung's foreign companies to help support his personal investments.

While commingling funds alone is not enough to find that money was misappropriated, commingling funds combined with failing to regard funds as

**[*36]** subject to restriction on their use may show misappropriation. See Bailey v. Commissioner, T.C. Memo. 2012-96. The facts in the record clearly show that Mr. Sun treated the money in the officer loan account--including the money he potentially used for "investments"--as funds without any restrictions. The record shows that Mr. Sun viewed the officer loan account as his personal repository of funds that he could use for any reason, and the money that was transferred to his "investments" was not in substance transfers on behalf of Mr. Cheung but instead on behalf of Mr. Sun. The outflow of funds to Mr. Sun's investments is a convenient surrogate to support his contention that the money was used for the benefit of Mr. Cheung; but the commingling and the abandonment of restrictions supports a conclusion that any money used as an investment was for Mr. Sun, not Mr. Cheung.

Mr. Sun misappropriated the funds for personal use, abandoned the intended purpose for which the money was entrusted, and he did not invest the money in accordance with the agreed-upon strategy. Accordingly, all the money transferred to Minchem's officer loan account from Mr. Cheung's foreign companies in 2008

**[\*37]** and 2009 is income to Mr. Sun because he treated the funds as his own, rather than as restricted funds held in a fiduciary capacity.[22]

IV. Other Transfers

Besides transferring money to Minchem, Mr. Cheung's foreign companies transferred funds directly to Mr. Sun's E\*Trade account and to Sun Investment. Mr. Sun's E\*Trade account received a total of $1,599,977 as a result of two transfers from Mr. Cheung's foreign companies in 2008. Sun Investment received a total of $3,257,901 as a result of three transfers from Mr. Cheung's foreign companies in 2008. Sun Investment also received $299,967 from Mr. Cheung's foreign companies in 2009.

Similar to the money transferred into Mr. Sun's E\*Trade account from Minchem's officer loan account, the money transferred directly to Mr. Sun's E\*Trade account from Mr. Cheung's foreign companies was commingled and not specifically earmarked as belonging to Mr. Cheung. Instead Mr. Sun treated all the funds in his E\*Trade account as his personally. Further, Mr. Sun treated all the gains, losses, and dividends from his E\*Trade account as personal. For

---

[22]The additional $825,059.49, although not deposited into Minchem's officer loan account, was wire transferred to Minchem. The record does not reflect what happened to the $825,059.49 that was not reported in the officer loan account, but the Court will presume that Mr. Sun also used the funds as his own. See supra note 10.

[*38] example, Mr. Sun's E*Trade account records show that in 2008 the account was paid $97,600 in taxable dividends. Mr. Sun reported $97,600 in ordinary dividends on his 2008 personal tax return as received by his E*Trade account. The Court finds that he was treating all the money transferred to his E*Trade account as his own. He therefore did not treat the money as funds subject to any restrictions but showed he was investing the money for himself rather than Mr. Cheung. See Bailey v. Commissioner, T.C. Memo. 2012-96. Accordingly, the commingling and the abandoning of the original purpose of investing on behalf of Mr. Cheung support a conclusion that the income transferred to Mr. Sun's E*Trade account from Mr. Cheung's foreign companies is income to Mr. Sun.

The amounts transferred to Sun Investment are also income to Mr. Sun because he did not honor the intended investment strategy or treat the money as subject to any use restrictions. Mr. Sun treated all the money transferred to Sun Investment as his personal money. Sun Investment's specific treatment of the transfers indicate that the money was Mr. Sun's personal money. First, Sun Investment did not give Mr. Cheung a membership interest. Second, Sun Investment did not increase its liabilities as a result of the transfers. Third, Sun Investment increased Mr. Sun's capital account for incoming transferred money.

[*39] Sun Investment is organized as a limited liability company (LLC) that is taxed as a partnership. In general, owners of LLCs are called members and each member is allocated his or her portion of the LLC's income, gain, loss, deductions, or credits in accordance with the partnership agreement or his or her membership share. See sec. 704(a) and (b). An investor who contributes money to obtain an interest in an LLC generally takes a basis in his or her interest in the LLC equal to the amount of money contributed. Sec. 722. Further, LLCs treated as partnerships may maintain capital accounts, which may be helpful to track partners' economic interests in the LLC. Sec. 1.704-1(b)(2)(iv), Income Tax Regs.

Mr. Sun directed Mr. Cheung's foreign companies to send money to Sun Investment, but Sun Investment did not recognize any new members in 2008 or 2009. Mr. Cheung was not allocated any portion of Sun Investment's income, gain, loss, deductions, or credits. Further, Mr. Cheung did not maintain a capital account with Sun Investment, and Sun Investment did not recognize any new capital accounts for 2008 or 2009. Instead, Sun Investment stayed a two-member LLC and the distributive share of the income, gain, loss, deductions, or credits remained the same for the two members during 2008 and 2009.[23] Thus, the money

---

[23]Sun Investment may have shifted 0.000001% distributive share of the profits from Mr. Sun to the other member in 2009.

[*40] transferred to Sun Investment did not represent a direct investment by Mr. Cheung because he did not take a membership interest in the LLC, nor was the foreign person-foreign corporation investment reflected in Sun Investment's tax returns.

Similarly, the money transferred to Sun Investment did not represent a loan from Mr. Cheung's foreign companies to Sun Investment because the foreign companies and Sun Investment did not create a debtor/creditor relationship and Sun Investment did not recognize the money as a loan from Mr. Cheung's foreign companies. Mr. Sun represented that the transfers from Mr. Cheung's foreign companies to Sun Investment were personal loans from Mr. Cheung, although Sun Investment did not reflect that position on its tax return

The facts show that the transfers were not loans. Mr. Sun and Mr. Cheung did not agree on terms specific enough to establish the creation of a debtor/creditor relationship for the overall structure, nor did they establish a debtor/creditor relationship between Mr. Cheung and Sun Investment. See Beaver v. Commissioner, 55 T.C. at 91; Fisher v. Commissioner, 54 T.C. at 909-911; Grzegorzewski v. Commissioner, T.C. Memo. 1995-49. Further, despite Sun Investment's claim that the $2,059,334 transferred from Mr. Cheung's foreign companies was a loan, Sun Investment reported only a $309,913 increase in

[*41] liabilities for 2008.[24] For 2009 Sun Investment reported that its total liabilities increased by $285,087 despite claiming that Mr. Cheung's foreign companies loaned $299,967 to the LLC.[25] Accordingly, Sun Investment's assertion that Mr. Cheung loaned the money to Sun Investment conflicts with its Forms 1065, and the money was not a loan to Sun Investment.

Similar to the substance of the transfers of funds to Minchem's officer loan account discussed above, the substance of the transfers to Sun Investment appears to be that Mr. Cheung's companies intended to entrust Mr. Sun with funds specifically earmarked for investment purposes. Instead of creating a debtor/creditor relationship, Mr. Cheung entrusted Mr. Sun to invest the money. Mr. Sun did not invest on behalf of Mr. Cheung but instead chose to use the money for his personal investment in Sun Investment. Sun Investment shows that the increase in money was from Mr. Sun personally because on Mr. Sun's 2008 Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., Sun Investment reported that Mr. Sun contributed an additional $3,436,324 of capital

---

[24]Sun Investment reported a $52,166 increase in "other current liabilities" and a $257,747 increase in "mortgages, notes, bonds payable in 1 year or more" on its 2008 Form 1065, U.S. Return of Partnership Income.

[25]Sun Investment reported increases of $312 in "other current liabilities" and $284,775 in liabilities for "mortgages, notes, bonds payable in 1 year or more" on the LLC's 2009 Form 1065.

[*42] to the LLC in 2008. Similar, Sun Investment reported on Mr. Sun's 2009 Schedule K-1 that Mr. Sun contributed an additional $796,387 of capital to the LLC in 2009.

Thus, Mr. Sun was treating the money transferred from Mr. Cheung's foreign companies as his own. Mr. Cheung did not take a membership interest in Sun Investment; Sun Investment did not recognize that the money was a loan from Mr. Cheung but instead increased Mr. Sun's capital account in 2008 and 2009. Accordingly, the money transferred directly to Sun Investment is income to Mr. Sun.

## V. Penalties

Respondent determined penalties under section 6663(a) for both Minchem and the Suns for 2008 and 2009. Respondent determined Minchem is liable for section 6663(a) penalties of $2,784,405.75 and $772,814.25 for 2008 and 2009, respectively. Respondent originally determined the Suns were liable for section 6663(a) penalties of $2,542,290 and $427,663.50 for 2008 and 2009, respectively. These fraud penalties represented 75% of each of the Suns' total underpayments. Respondent later conceded that the portions of the underpayments resulting from the 2009 investment interest expense deduction and the unreported income from personal meals and entertainment expenses paid by Minchem in 2008 and 2009

[*43] were not due to fraud. Thus, the Suns are not liable for 75% penalties under section 6663(a) on the portions of the underpayments stemming from these items. Respondent instead argues that the Suns are liable for penalties under section 6662 for the portions of the underpayments attributable to these items.

In the alternative to the remaining section 6663(a) penalties, respondent determined that the Suns and Minchem are liable for accuracy-related penalties for the 2008 and 2009 years as a result of the transfers from Mr. Cheung's foreign companies. Specifically, respondent alternatively determined the Suns owe accuracy-related penalties of $677,944 and $114,043.60 for 2008 and 2009, respectively. Respondent alternatively contends that Minchem owes accuracy-related penalties of $742,508.20 and $206,083.90 for 2008 and 2009, respectively.

A. Section 6663(a) Penalties

Respondent argues that petitioners are liable for the section 6663 fraud penalties for the years in issue. Fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to be owing. Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), aff'g T.C. Memo. 1986-223. A penalty equal to 75% will be imposed on any part of the taxpayer's underpayment of Federal income tax that is due to fraud. Sec. 6663(a). Further, if any portion of the underpayment is attributable to fraud, the entire underpayment

**[*44]** will be treated as attributable to fraud unless the taxpayer establishes by a preponderance of the evidence that part of the underpayment is not due to fraud. Sec. 6663(b); see Foxworthy, Inc. v. Commissioner, T.C. Memo. 2009-203, aff'd, 494 Fed. Appx. 964 (11th Cir. 2012).

Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for each of the years in issue and that some portion of the underpayment is due to fraud. See secs. 6663(a), 7454(a); Rule 142(b); Clayton v. Commissioner, 102 T.C. 632, 646 (1994).

As discussed above, Minchem does not have underpayments as a result of the transfers from Mr. Cheung's foreign companies because in substance the funds were merely deposited in Minchem's officer loan account, which was for the benefit of Mr. Sun, who then misappropriated the funds by either using the money for personal reasons or leaving the money in Minchem's officer loan account. Accordingly, Minchem is not liable for fraud penalties under section 6663(a) for 2008 and 2009.

The Suns, on the other hand, do have underpayments as a result of the transfers from Mr. Cheung's foreign companies to Minchem for 2008 and 2009. The Suns have further underpayments as a result of the transfers to Mr. Sun's

**[\*45]** E\*Trade account and Sun Investment. Accordingly, respondent has met the burden with respect to this requirement of the section 6663(a) fraud penalty.

Respondent must also prove by clear and convincing evidence that petitioners had the requisite fraudulent intent. Parks v. Commissioner, 94 T.C. 654, 664 (1990). Fraud is intentional wrongdoing designed to evade tax believed to be owing. Neely v. Commissioner, 116 T.C. 79, 86 (2001). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). Fraud is not to be presumed or based upon mere suspicion. Petzoldt v. Commissioner, 92 T.C. 661, 699-700 (1989). However, because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence. Grossman v. Commissioner, 182 F.3d 275, 277-278 (4th Cir. 1999), aff'g T.C. Memo. 1996-452. The Commissioner satisfies this burden of proof by showing that "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." Parks v. Commissioner, 94 T.C. at 661. The taxpayer's entire course of conduct may be examined to establish the requisite intent, and an intent to mislead may be inferred from a pattern of conduct. Webb v. Commissioner, 394 F.2d 366, 379 (5th Cir.

**[\*46]** 1968), aff'g T.C. Memo. 1966-81; Stone v. Commissioner, 56 T.C. 213, 224 (1971).

Circumstances that may indicate fraudulent intent, commonly referred to as "badges of fraud," include but are not limited to:  (1) understating income; (2) maintaining inadequate records; (3) giving implausible or inconsistent explanations; (4) concealing income or assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) providing incomplete or misleading information to one's tax preparer; (8) lack of credibility of the taxpayer's testimony; (9) filing false documents, including false income tax returns; (10) failing to file tax returns; and (11) dealing in cash.  Spies v. United States, 317 U.S. 492, 499 (1943); Morse v. Commissioner, T.C. Memo. 2003-332, aff'd, 419 F.3d 829 (8th Cir. 2005).  No single factor is dispositive; however, the existence of several factors "is persuasive circumstantial evidence of fraud." Vanover v. Commissioner, T.C. Memo. 2012-79, slip op. at 11.

After reviewing the facts and the badges of fraud, the Court concludes that respondent has failed to meet the burden to show that either of the Suns had the requisite fraudulent intent to impose penalties under section 6663(a).  While respondent asserted 10 different badges applied to the Suns, several of the asserted

**[*47]** badges were duplicative.[26] Excluding the duplicative badges, respondent contends the following factors are present in this case: (1) the Suns underreported income for both 2008 and 2009; (2) the Suns failed to maintain adequate records; (3) the Suns offered implausible and inconsistent explanations; (4) the Suns failed to cooperate with tax authorities; (5) the Suns provided incomplete or misleading information to their tax preparers; (6) Mr. Suns' testimony was not credible; and (7) the Suns filed false documents, including false income tax returns.

   1. Understating Income

A pattern of substantially underreporting income for several years is strong evidence of fraud, particularly if the understatement is not satisfactorily explained or due to innocent mistake. See Holland v. United States, 348 U.S. 121, 137-139 (1954); Spies, 317 U.S. at 499; Webb v. Commissioner, 394 F.2d at 379; Morse v. Commissioner, T.C. Memo. 2003-332; see also Green v. Commissioner, T.C. Memo. 2010-109 (finding that a satisfactory explanation may weigh against a finding of fraud).

---

[26]Respondent's badge of "Omission of entire source of income" fits within the "understating income" badge, also asserted by respondent. Respondent's badge of "Making inconsistent representations" fits within the "Implausible and inconsistent explanations" badge, also asserted by respondent. Last, respondent's "False statement about a material fact" fits within the "Lack of credibility of the taxpayer's testimony" badge, also asserted by respondent.

**[\*48]** The Suns underreported income for the years in issue as a result of the transfers from Mr. Cheung's foreign companies.  Mr. Sun used the money as his own and did not report the funds as income.  This weighs in favor of finding fraudulent intent as to Mr. Sun.

### 2.  Maintaining Inadequate Records

Fraudulent intent can be inferred from a failure to maintain adequate books and records.  See Scott v. Commissioner, T.C. Memo. 2012-65; Ark. Oil & Gas, Inc. v. Commissioner, T.C. Memo. 1994-497.  Respondent contends that the lack of loan documents is indicative of fraudulent intent.  Respondent does not assert and did not offer any evidence showing that Minchem or Mr. Sun was keeping multiple books or inadequate accounting records.  Respondent instead contends that it is implausible that Mr. Sun and Mr. Cheung had a verbal loan agreement.  Respondent also contends that the officer loan account arrangement is implausible.  Respondent did not offer evidence or testimony to support contentions that verbal loan agreements were implausible.  Respondent relies on a contention that "this is not the usual way that sophisticated people behave".  In contrast, Mr. Sun credibly testified that he often engaged in business transactions without documentation.  Thus, while the Court ultimately decides that the substance of the transactions was

**[*49]** not a loan, respondent did not carry the burden to show that the Suns failed to maintain adequate records. Accordingly, this factor is neutral.

### 3. Giving Implausible or Inconsistent Explanations

A taxpayer's implausible or inconsistent explanations for his actions may constitute circumstantial evidence of fraudulent intent. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Bahoric v. Commissioner, 363 F.2d 151, 153 (9th Cir. 1966), aff'g T.C. Memo. 1963-333; Gagliardi v. United States, 81 Fed. Cl. 772, 784 (2008). Respondent primarily relies on inconsistencies between Mr. Cheung's and Mr. Sun's testimony to show inconsistent explanations. This looks more like two people's not reaching an agreement before conducting a transaction than like Mr. Sun's giving inconsistent explanations for his actions. In fact, Mr. Sun's explanations regarding the transactions were consistent throughout the proceeding. He may not have understood the implications of his actions, but the record does not indicate that he offered inconsistent explanations with the intent to evade any tax owed. Further, as discussed above, respondent contends that the loan arrangements were implausible but does not offer testimony or other evidence to support his assertion that verbal loan arrangements are necessarily implausible.

**[*50]**  Thus, respondent has failed to show Mr. Sun offered implausible or inconsistent explanations.  This factor is neutral.

### 4.  Failing To Cooperate With Tax Authorities

Failing to cooperate with tax authorities is indicative of fraud.  Bradford v. Commissioner, 796 F.2d at 307-308.  Respondent contends that both of the Suns failed to cooperate with tax authorities when they failed to respond to three information requests (IDR) and were rude to revenue agents.  Respondent admitted that he previously possessed the information requested in one of the IDRs but requested the information through an IDR for ease.  The Suns' certified public accountant (CPA) credibly testified that the Suns had sent all the information that they had to satisfy the outstanding IDRs.  Any information not provided was information the Suns did not have.

Respondent also contends that the Suns were rude to one of his agents.  The agent, however, appears to have ignored a request by the Suns' CPA to honor a power of attorney and not directly contact Mr. Sun.  Instead the agent may have been bypassing the CPA with power of attorney to seek information directly from the Suns.  It is understandable that the Suns may have become frustrated with a revenue agent who did not honor a power of attorney.  Accordingly, this factor is neutral for fraudulent intent.

**[\*51]**     5. <u>Providing Incomplete or Misleading Information to One's Tax Preparer</u>

Evidence that a taxpayer provided incomplete or misleading information to his return preparer is circumstantial evidence of fraud. See <u>Morse v. Commissioner</u>, 419 F.3d at 823-833. A taxpayer acts fraudulently when he conceals income from his return preparer. See <u>Korecky v. Commissioner</u>, 781 F.2d 1566, 1569 (11th Cir. 1986), <u>aff'g</u> T.C. Memo. 1985-63; <u>Patel v. Commissioner</u>, T.C. Memo. 2008-223; <u>Morse v. Commissioner</u>, T.C. Memo. 2003-332. Respondent contends that Mr. Sun provided misleading information to his CPA by giving him Minchem's complete general ledger. Specifically, respondent contends that the officer loan account is misleading and it should not have been used to prepare the Suns' tax returns. As discussed above, Mr. Sun misappropriated the funds transferred by Mr. Cheung's foreign companies, but the officer loan account arrangement was not in itself misleading. In fact, the officer loan account arrangement is consistent with Mr. Sun's misappropriation because Minchem, as well as Mr. Sun, treated the funds as his personally. Thus, Mr. Sun did not offer misleading information to his CPA by giving him Minchem's complete general ledger. Respondent offers no other testimony or other evidence

**[*52]** demonstrating that the Suns provided incomplete or misleading information. Accordingly, this factor favors the Suns.

### 6. Lack of Credibility of the Taxpayer's Testimony

A taxpayer's lack of credibility, "the inconsistencies in his testimony and his evasiveness on the stand[,] are heavily weighted factors in considering the fraud issue." Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), aff'g T.C. Memo. 1984-25; Devries v. Commissioner, T.C. Memo. 2011-185. Respondent contends that Mr. Sun offered incredible and inconsistent testimony. However, Mr. Sun was credible in his testimony. He was not evasive, he admitted that he used large quantities of the money for personal purposes, and he was consistent with regard to his understanding of the arrangement. He credibly testified that he thought he was allowed unrestricted use of the money, despite the fact that he was mistaken about the implications of treating the funds as his own. In other words, Mr. Sun was credible and consistent, but wrong. Accordingly, this factor is neutral.

### 7. Filing False Documents, Including False Income Tax Returns

Fraudulent intent may be inferred when a taxpayer files a tax return intending to conceal, mislead, or prevent the collection of tax. See Spies, 317 U.S. at 499. Respondent contends this badge is very similar to the "Understating

**[\*53]** Income" factor discussed above. Respondent contends that the Suns filed false returns by failing to report income. However, respondent has not pointed to any evidence suggesting that the Suns' failure to report the income was a result of an attempt to conceal, mislead, or prevent the collection of tax.[27] Respondent's position appears to be that all incorrect tax returns are fraudulent simply because they are incorrect. Failure to report income is not necessarily fraudulent and may be by misunderstanding. Respondent has failed to show the Suns filed documents with the intent to conceal, mislead, or prevent the collection of tax. Accordingly this factor is neutral.

In sum, only one badge of fraud points to finding fraudulent intent; the other asserted badges are either neutral or favor the Suns' position. After weighing the facts, the Court finds that respondent has not met his burden to show the Suns had the requisite fraudulent intent to impose a penalty under section 6663(a) for 2008 or 2009.

---

[27]Respondent did not introduce evidence or pursue any potential reporting requirements in regard to a nonresident alien or a foreign company transferring large quantities of money into the United States for a purported investment. But for the obvious gift reporting requirement discussed in detail supra p. 29, the Court will not attempt to analyze any additional potential failure of reporting requirements in regard to the wire transfers and investments.

**[*54]** B. <u>Section 6662 Penalties</u>

In the alternative to the fraud penalties under section 6663(a) relating to the treatment of the transfers by Mr. Cheung's foreign companies, respondent determined that the Suns and Minchem are liable for accuracy-related penalties for 2008 and 2009. Respondent also contends that the Suns are liable for an accuracy-related penalty relating to the investment interest expense deduction for 2009 and for the deductions for personal expenses paid directly by Minchem but not through the officer loan account. As discussed above, Minchem does not have an underpayment as a result of the transfers. Accordingly, Minchem is not liable for a penalty under section 6662 relating to the transfers.[28]

Section 6662(a) and (b)(1) and (2) authorizes the imposition of a 20% penalty on the portion of an underpayment of tax that is attributable to, among other things, (1) negligence or disregard of rules or regulations or (2) any substantial understatement of income tax. Only one accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one of the reasons identified in section 6662(b). Sec. 1.6662-2(c), Income Tax Regs.

[28]Petitioners' conceding the adjustments to Minchem's business expense deductions for the Suns' travel and entertainment will result in a penalty under sec. 6662(a) and a Rule 155 computation.

**[\*55]** The Commissioner bears the initial burden of production with respect to the taxpayer's liability for the section 6662 penalty. Sec. 7491(c). The Commissioner must introduce sufficient evidence "indicating that it is appropriate to impose the relevant penalty." Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. Id. at 446-447.

The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. Disregard of rules or regulations "is 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position" and "is 'reckless' if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which

[*56] demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Sec. 1.6662-3(b)(2), Income Tax Regs.; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Respondent has met his burden to show that the Suns carelessly, recklessly, or intentionally disregarded rules and regulations for their home equity loan interest deduction. The Suns did not exercise reasonable diligence to determine whether the deduction was correct. In fact it appears they specifically looked for a method to deduct all of the home equity loan interest without determining whether a rule or regulation prevented the deduction. On one Form 1098 someone specifically noted that all of the interest was to be deducted somehow.[29] Accordingly, respondent has met his burden of production to show that a section 6662 penalty for the home equity loan interest deduction for tax year 2009 is appropriate.

Respondent has also met his burden to show that the Suns acted negligently or with careless disregard of rules and regulations with regard to the income received from Mr. Cheung's foreign companies, Mr. Sun's excluded gambling

---

[29]The note on a Form 1098 sent from Mr. Sun for tax year 2009 read "$60,000 to mtg int[,] bal. to invest int exp", meaning that $60,000 of the home equity loan interest would be deducted as mortgage interest and the remaining interest would be deducted as an investment interest expense. The Suns' CPA followed this note and deducted the interest accordingly.

[*57] income, and the personal travel and entertainment paid for by Minchem. Mr. Sun used the money transferred by Mr. Cheung's foreign companies for personal purposes and did not attempt to comply with the provisions of the internal revenue laws. He failed to look into the implications of receiving the money and to investigate the obligations associated with using the money. A reasonable and prudent person would think receiving the funds from Mr. Cheung's foreign companies tax free, report free, and with an un-agreed-upon obligation to repay the money is "too good to be true". It was also too good to be true that Mr. Sun could use Mr. Cheung's money for gambling activities or that Minchem could pay the Suns' personal travel and entertainment costs without their being taxed on the income. Accordingly, respondent has met his burden and shown that the Suns were negligent in failing to report income from transfers by Mr. Cheung's foreign companies, Mr. Sun's gambling income, and personal travel and entertainment paid for by Minchem in 2008 and 2009.

Taxpayers may avoid liability for the section 6662(a) penalty if they demonstrate that they had reasonable cause for the underpayment and that they acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income

**[\*58]** Tax Regs.  The most important factor is the extent of the taxpayer's efforts to assess his or her proper tax liability.  Id.  Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable."  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). The Court has previously held that the taxpayer must satisfy a three-prong test to be found to have reasonably relied on professional advice to negate a section 6662(a) accuracy-related penalty:  (1) the adviser was a competent professional who had sufficient experience to justify the reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

The Suns contend that they relied on their CPA to prepare their 2008 and 2009 tax returns and thus should not be liable for the accuracy-related penalties. Reliance necessary to escape the penalty under section 6662(a) does not occur when a taxpayer merely provides raw numbers to an accountant for the accountant to prepare the return and the taxpayer does not carefully examine the return.  See Woodsum v. Commissioner, 136 T.C. 585, 594, (2011) ("In signing the return thus erroneously prepared, petitioners were not deliberately following substantive

[*59] professional advice; they were instead unwittingly (they contend) perpetuating a clerical mistake. The defense of reliance on professional advice has no application here."); Jackson v. Commissioner, T.C. Memo. 2014-160.  In other words, a taxpayer cannot escape the penalty when the taxpayer does not seek or receive an opinion from his or her preparer.  See Todd v. Commissioner, T.C. Memo. 2011-123, aff'd, 486 Fed. Appx. 423 (5th Cir. 2012).  The mere fact that a CPA has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein.  Neonatology v. Commissioner, 115 T.C. at 100. The Suns did not show that they relied on their tax preparer's advice or opinions. Instead, the record reflects the Suns' CPA prepared the tax returns but did not offer any advice or opinions on the positions taken on the returns.  See id.  The Suns turned over financial information to their CPA and the CPA prepared the returns according to the received information.  Mr. Sun did not ask about receiving the money from Mr. Cheung's foreign companies or about spending that money. Further, there is no evidence that Mr. Sun sought advice regarding the home equity loan interest deductions or the travel and entertainment paid for by Minchem.  Thus there was no advice on which Mr. Sun could have relied to escape the penalties.  Accordingly, the Suns cannot use section 6664 to escape the accuracy-related penalty under section 6662(a) for 2008 or 2009.

**[\*60]** The Court, in reaching its holdings, has considered all arguments made, and, to the extent not mentioned, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.