# United States Tax Court

T.C. Memo. 2024-24

JAMES ELBERT ALDRIDGE, JR. AND
SHIRLEY LORRAINE ALDRIDGE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 13742-10.                    Filed February 21, 2024.

———————

James Elbert Aldridge, Jr., and Shirley Lorraine Aldridge, pro sese.

*Randall L. Eager*, *Christina L. Holland*, and *Shaina E. Boatright*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, *Judge*:  By notice of deficiency dated March 31, 2010, respondent determined deficiencies in petitioners' federal income tax and fraud penalties pursuant to section 6663[1] as follows:

| Year | Deficiency | § 6663 Penalty |
|------|-----------|----------------|
| 1999 | $72,896 | $54,672.00 |
| 2000 | 92,891 | 69,668.25 |

———————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[*2]**

| | | |
|---|---|---|
| 2001 | 177,319 | 132,989.25 |
| 2002 | 190,472 | 142,854.00 |
| 2003 | 62,277 | 46,707.75 |
| 2004 | 50,547 | 37,910.25 |

The issues for decision are as follows:

1.  Whether petitioners failed to report net business income, dividend income, and interest income for tax years 1999 through 2004 in the following amounts:

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Net business income | $185,430 | $121,207 | $459,898 | $502,412 | $194,351 | $153,593 |
| Dividend income | 30 | 46 | 62 | 200 | 200 | 200 |
| Interest income | 465 | 13,610 | 2,479 | 1,055 | 757 | 988 |

2.  Whether petitioners failed to report pension and annuity income of $97,921 for tax year 2000;

3.  Whether petitioners are entitled to deductions for taxes paid and mortgage interest claimed on Schedule A, Itemized Deductions, attached to their 1999 tax return;

4.  Whether petitioners are liable for civil fraud penalties pursuant to section 6663(a) for tax years 1999 through 2004;

5.  Whether the period of limitations on assessment remains open pursuant to section 6501(c)(1) with respect to petitioners' tax years 1999 through 2004.

Petitioners bear the burden of proof, *see* Rule 142(a), except that, with respect to the issue of fraud with intent to evade tax, the burden is on respondent, who must carry it by clear and convincing evidence, *see* § 7454(a); Rule 142(b).

**[\*3]**                               FINDINGS OF FACT

Petitioners, James Aldridge and Shirley Aldridge, were married at all times during the years at issue and filed joint tax returns for 1999 through 2004.[2] At the time they filed the Petition, petitioners were incarcerated. Mr. Aldridge resided at the Englewood Federal Correctional Institution in Colorado, and Ms. Aldridge resided at the Carswell Federal Medical Center in Texas. Before and following their incarceration, petitioners resided in Missouri.[3]

I.    *Criminal Conviction*

On June 27, 2006, following a lengthy criminal investigation by special agents within the Internal Revenue Service (IRS) Criminal Division,[4] a grand jury approved a five-count indictment against petitioners for filing false tax returns in violation of section 7206(1) and aiding and abetting the filing of false tax returns in violation of 18 U.S.C. § 2 for tax years 2000 through 2004.

On May 4, 2007, following a two-week trial, a jury found petitioners guilty on all five counts charged in the indictment. Mr. Aldridge served nine years in prison, and Ms. Aldridge served five years and three months in prison.

II.    *Petitioners' Background*

Mr. Aldridge graduated from high school in 1975, after which he attended the University of Kansas, where he studied architectural engineering and received a certificate in structural drafting.

Beginning in 1979 Mr. Aldridge worked a series of sales jobs until joining Concept Marketing International (CMI) in 1989. Mr. Aldridge

---

[2] At the time of trial, petitioners were no longer married.

[3] Although Mr. and Ms. Aldridge were detained in Colorado and Texas, respectively, at the time they filed the Petition in this case their legal residence for purposes of appeal venue remained in Missouri, the state in which they resided before and after incarceration. *See, e.g.*, *Berkery v. Commissioner*, 90 T.C. 259, 262–63 (1988) *vacated on other grounds*, 91 T.C. 179 (1988); *Brewin v. Commissioner*, 72 T.C. 1055, 1059 (1979), *rev'd and remanded on other grounds* 639 F.2d 805 (D.C. Cir. 1981); *Smith v. Commissioner*, T.C. Memo. 1989-171, *aff'd*, 926 F.2d 1470 (6th Cir. 1991). Because the parties have not stipulated a venue for appeal, venue for purposes of an appeal in this case would be the U.S. Court of Appeals for the Eighth Circuit. *See* § 7482(b).

[4] The IRS criminal investigation is described in greater detail *infra*.

[*4] obtained a real estate agent's license in 1980 and formed a real estate company called Lorbert & Co. Real Estate Investment and Management (Lorbert). Lorbert focused on buying and selling owner-financed homes and remained in operation through the 2000s.

Ms. Aldridge holds a bachelor's degree in engineering from the University of Kansas. From 1979 until 1999 she was employed by the Southwestern Bell Corp., where she held various positions in engineering, project design, and management. Ms. Aldridge left Southwestern Bell in 1999. In 2000, after leaving Southwestern Bell, Ms. Aldridge took a distribution of $97,921 from her Southwestern Bell pension benefit fund and deposited those funds into a money market account titled in the name of the Liberty Commerce Group Trust.

III.   *CMI*

CMI was a corporation whose sole shareholders were Greg Rogers and Sherry Parrott. In 1989 Mr. Rogers recruited Mr. Aldridge to serve as head of sales, marketing, and training for CMI. CMI was a multilevel marketing structure that sold American Silver Eagle coins; its sales representatives would earn commissions not only on the sale of the coins, but also on recruitment of their customers to sell the coins. Mr. Aldridge, as sales manager, not only trained other sales representatives but also made presentations at seminars, focusing on investing in American Silver Eagle coins through CMI.

CMI's business grew rapidly during those years. In its first year CMI's sales were minimal. In its second year its sales revenue increased to over $600,000, and by its third year its sales revenue exceeded $1.2 million.

IV.   *Reorganization of CMI and Creation of the Aldridge Family Trust System*

A.   *National Trust Services Seminar*

In 1992 petitioners attended a two-day seminar held by National Trust Services following customer suggestions that they might reorganize CMI as a trust. Petitioners convinced Mr. Rogers that reorganizing as a trust would benefit CMI, and Mr. Rogers agreed to provide the $9,500 tuition for the workshop. National Trust Services instructed attendees on how to devise a family trust system that would purportedly allow them to control the amount of tax they would pay and convert their living expenses to business expenses. The workshop

**[\*5]** instructors walked petitioners through the preparation of documents to set up the trusts, and by the end of the workshop, petitioners had executed documents purporting to create trusts, transferring their property to the trusts, and applying for employer identification numbers.[5]

B.    *The Aldridge Family Trust System*

Following the National Trust Services workshop, petitioners began to place all of their business and personal assets in a tiered trust arrangement (collectively, Aldridge Family Trust System). The trust system was established using several steps:

1.   On March 25, 1993, Ms. Aldridge executed a bill of sale and quitclaim deed by which she conveyed to Mr. Aldridge all of her interests in all real and personal property, including all clothing, furniture, household items, personal effects, and her interest in their home, in exchange for $10 and other consideration.

2.   Also on March 25, 1993, Mr. Aldridge, as grantor, executed a declaration of trust prepared by National Trust Services entitled "The Aldridge Family Trust". In the declaration of trust, Mr. Aldridge promised to convey to the trust all of his "rights, title, and interest" in all of his real and personal property, including "[t]he exclusive use of His [sic] lifetime services, including ALL of His [sic] earned remuneration accruing therefrom, from ANY current source whatsoever . . . ." In exchange, Mr. Aldridge received all 100 beneficial units in the Aldridge Family Trust. The declaration of trust was signed by Ms. Aldridge and a representative from National Trust Services, as trustees.

3.   Between March 26 and April 17, 1993, Mr. Aldridge executed a bill of sale and quitclaim deeds which recited that he conveyed all of his interest in real and personal property to the Aldridge Family Trust in exchange for $10 and other consideration.

---

[5] By use of the terms "trust," "trustee," "beneficiary," and other related terms, the Court intends no implication as to the validity of the trusts involved in this case.

**[*6]**   4. On March 25, 1993, petitioners executed a declaration of trust establishing the Concept Marketing International Trust (CMI Trust).

5. At some time between March 26 and April 3, 1993, Mr. Rogers contributed his ownership interest in CMI to the CMI Trust in exchange for 100 beneficial units of the CMI Trust.

6. Mr. Rogers conveyed 50 beneficial units of the CMI Trust to the Aldridge Family Trust.

At or around the same time, petitioners executed documents to establish two other trusts. Petitioners formed the Lorbert & Co. Trust (Lorbert Trust), to which Mr. Aldridge executed quitclaim deeds purporting to convey their personal residence and all of their rental properties from the Aldridge Family Trust. Mr. Aldridge served as trustee of the Lorbert Trust.

Petitioners also formed the Excalibur Trust and executed documents purporting to convey title to their personal vehicles to the trust. Petitioners named themselves trustees of Excalibur Trust and entered into lease agreements with the Aldridge Family Trust for the use of the vehicles under "terms to be determined." No rent or other payment was ever made for the use of the vehicles.

V.    *Liberty Commerce Group Trust*

A.    *Formation*

Around 1994 or 1995 Mr. Aldridge became a trust counselor for National Trust Services and Trust Educational Services, another entity promoting family trust schemes similar to those offered by National Trust Services. Mr. Aldridge worked as an independent contractor, and he formed a new trust, Liberty Commerce Group Trust, out of which he operated his trust counselor business. Mr. and Ms. Aldridge were trustees of Liberty Commerce Group Trust, and its sole beneficiary was the Aldridge Family Trust.

Around this time, petitioners also created Alliance Financial Trust as a vehicle for numismatic investment. Petitioners were the trustees of Alliance Financial Trust, and all of its income or loss flowed to Liberty Commerce Group Trust.

**[\*7]** B.     *Business Activity*

As a trust counselor, Mr. Aldridge gave seminars and presentations to prospective clients of the trust system. Mr. Aldridge's seminars discussed the purported tax benefits of family trust systems, telling potential clients that such systems could reduce or eliminate their taxes if they transferred their homes and other assets to the trust and assigned all future income to the trust. Mr. Aldridge pushed the trust systems on the basis of claims that the trust system could be used to pay the trustees' or beneficiaries' personal expenses, such as their mortgages, utility bills, and automobile payments, converting the personal expenses to deductible business expenses of the trust and thereby reducing income. If, after the seminar, the client wished to restructure his business under the trust system, Mr. Aldridge would refer the client to National Trust Services or Trust Education Services. Mr. Aldridge earned a commission, typically ranging between $1,500 and $9,500, for each referral.

VI.     *CMI Trust*

A.     *Postreorganization Activities*

Before the creation of CMI Trust, Mr. Rogers and Ms. Parrot together owned 100% of the stock of CMI. Following the reorganization of CMI into CMI Trust, the trustees of CMI Trust were Mr. Rogers, Ms. Parrot, Mr. Aldridge, and Ms. Aldridge. Mr. Rogers and Ms. Parrot were each allotted 25 beneficial units in CMI Trust, and the Aldridge Family Trust received 50 beneficial units. In agreeing to reorganize his business in this way, it was Mr. Rogers's understanding that beneficial units were akin to ownership interests, and that he and Ms. Parrot would be entitled to a proportionate share of CMI Trust's profits.

CMI Trust continued to conduct its business in much the same manner as CMI had before the reorganization, selling American Silver Eagle coins through a multilevel marketing strategy. Mr. Rogers continued to handle customer service, distribution of the product, bookkeeping, and financials, while Mr. Aldridge continued to handle sales and marketing.

Shortly after the creation of CMI Trust and Liberty Commerce Group Trust, Mr. Aldridge began to market the trust system to CMI customers. Mr. Aldridge kept any money earned in connection with the trust systems for himself, and Mr. Rogers was unaware of Mr. Aldridge's activities until clients informed him.

[*8]    B.    *Removal of Mr. Rogers and Ms. Parrot*

In 1996 Mr. Aldridge informed Mr. Rogers and Ms. Parrott that a person was not allowed to be both a trustee and an owner of beneficial units of CMI Trust. As a solution, he proposed that Ms. Parrott resign as a trustee and Mr. Rogers transfer his beneficial units to her. Consequently, Ms. Parrott and the Aldridge Family Trust each held 50 beneficial units of the CMI Trust, and its trustees were Mr. Aldridge, Ms. Aldridge, and Mr. Rogers.

After learning that Mr. Aldridge was marketing the trust system to CMI clients without his knowledge, Mr. Rogers no longer wished to be in business with him. Mr. Rogers resigned from his position with CMI Trust in March 1996.

At the time of Mr. Rogers's resignation, Ms. Parrott still owned 50 beneficial units of CMI Trust, but neither she nor Mr. Rogers ever received any distributions from the trust. Mr. Rogers tried to contact petitioners, sending emails and registered letters requesting Ms. Parrott's share as a beneficial owner. Having received no response from petitioners, Mr. Rogers attempted to sell the units. He contacted two individuals, but neither had any interest.

Petitioners learned of Mr. Rogers's attempts to sell the units and, citing a provision of the trust documents prohibiting the sale of beneficial units, they voted to cancel Ms. Parrott's units. Petitioners, consequently, now owned 100% of the outstanding beneficial units of CMI Trust; and neither Ms. Parrott nor Mr. Rogers received any compensation or other value for the canceled units.

VII.    *Organization and Operation of the Aldridge Family Trust System*

A.    *Operation of Trusts and Flow of Income*

During the years at issue the trusts controlled by petitioners included CMI Trust, Liberty Commerce Group Trust, Alliance Financial Trust, the Aldridge Family Trust, Excalibur Trust, and Lorbert Trust. Petitioners organized their trusts as an affiliated trust group, with CMI Trust as the managing entity. During the years at issue, CMI Trust continued to sell American Silver Eagle coins and provide financial education services, and Liberty Commerce Group Trust continued to hold its trust seminars and refer clients to National Trust Services and Trust Educational Services. Alliance Financial Trust received funds from petitioners or from clients of CMI Trust and Liberty Commerce

**[*9]** Group and held numismatic investments. Excalibur held assets, including petitioners' vehicles, motorcycles, and jet skis, and purported to rent them to the Aldridge Family Trust but did not receive any rental payments. Lorbert Trust held rental properties.

Fifty percent of CMI Trust's income flowed to Liberty Commerce Group Trust, and the other 50% flowed to the Aldridge Family Trust. One hundred percent of Alliance Financial Trust's income also flowed to Liberty Commerce Group, and 100% of Liberty Commerce Group Trust's income flowed to the Aldridge Family Trust. One hundred percent of Lorbert Trust's income flowed to the Aldridge Family Trust, as well. Under this arrangement, then, all of the income from CMI Trust, Alliance Financial Trust, Lorbert Trust, and Liberty Commerce Group Trust ultimately went to the Aldridge Family Trust. The Aldridge Family Trust used this income to pay petitioners' personal living expenses, including their mortgage, utilities, and groceries, purchase clothing and vehicles, and cover nearly any other expense, describing them as business expenses. During the years at issue the beneficiary of the Aldridge Family Trust was petitioners' minor son. Any funds remaining were then transferred to the Aldridge Foundation, created in 1993 purportedly to support local charitable causes. The Aldridge Foundation, in turn, distributed those funds back to CMI Trust and Liberty Commerce Group Trust in the guise of loans.

### B. *Trust Headquarters*

From the beginning of 1999 until October 11, 1999, petitioners resided at a home on Byram's Ford Road in Kansas City, Missouri. From the formation of the Aldridge Family Trust in early 1999 until October 11, 1999, petitioners listed the same address as the address of each of the trusts in the Aldridge Family Trust System.

In October 1999 petitioners purchased a home on Sapphire Place in Lee's Summit, Missouri, for $319,200. The property was purchased in petitioners' names individually, and they applied for a loan of $240,000 in their individual capacity to finance the purchase. On their loan application, petitioners claimed gross monthly income of $10,716 and total assets worth $579,374.

Beginning in October 1999 and through the years at issue, petitioners resided in the home on Sapphire Place and also claimed it as the headquarters of CMI Trust, Liberty Commerce Group Trust, and the other trusts in the Aldridge Family Trust System.

[*10] VIII.   *Tax Returns*

A.   *Trust Returns*

Petitioners were aware as early as 1993, when they attended the National Trust Services seminar, that income received by their trusts would be taxable and that the trusts were required to file income tax returns. Ms. Aldridge was responsible for having the trusts' tax returns prepared and filed. With the exception of Alliance Financial Trust, which filed a tax return for the 2000 tax year, no tax returns were filed for any of the trusts for the 1996 through 2015 tax years. Petitioners occasionally requested extensions for the unfiled returns, but never made any estimated tax payments.

On Form 1041, U.S. Income Tax Return for Estates and Trusts, for 2000, Alliance Financial Trust reported adjusted total income of $5,771, distributions to Liberty Commerce Group Trust totaling $6,000, an income distribution deduction of $5,771, and total tax of zero.

Petitioners had difficulty finding anyone willing to prepare returns for their trusts. In 2004 Ms. Aldridge hired Chad Merica, a certified public accountant, to prepare returns for the trusts. At the time she hired him, Ms. Aldridge knew that Mr. Merica was under indictment for conspiracy to defraud the United States, a charge for which he was eventually convicted and sentenced to prison. Mr. Merica prepared returns for CMI Trust for tax years 1999 through 2003, but petitioners never filed those returns. For each of those years, the prepared but unfiled returns for CMI Trust showed negative taxable income on the ground that all revenue earned by CMI Trust was distributed to Liberty Commerce Group Trust or the Aldridge Family Trust.

Mr. Merica additionally prepared a tax return for Liberty Commerce Group Trust for 1999, which petitioners never filed. The unfiled return showed taxable income of −$100 and reflected a distribution of all profits to its beneficiary, the Aldridge Family Trust.

No returns were prepared for Lorbert Trust, Excalibur Trust, or the Aldridge Family Trust, nor for any tax year other than 2000 for Alliance Financial Trust. Nor did any of the beneficiaries file a return.

B.   *Personal Returns*

H&R Block prepared petitioners' tax returns, Forms 1040, U.S. Individual Income Tax Return, for each of the years at issue using

11

[*11] information returns provided by Ms. Aldridge. Petitioners did not elect to report their minor child's income on their personal return for any of the years. Petitioners timely filed their joint 1999 federal income tax return. They reported wage income of $57,043, taxable interest of $284, ordinary dividends of $337, taxable refunds of $1,270, a business loss of $2,638, and other income, designated "Trustees Fees" of $200, resulting in an adjusted gross income of $56,496. On Schedule C, Profit or Loss From Business, Mr. Aldridge listed his principal business or profession as "Advisor: Family Trust," and reported gross receipts or sales of $500 and car and truck expenses of $3,138. Petitioners claimed itemized deductions totaling $18,207 and exemptions of $8,250, resulting in taxable income of $30,039 and, after a child tax credit of $500, a total tax of $4,004.

On their timely filed joint 2000 federal income tax return, petitioners reported wage income of $31,031, taxable interest of $377, ordinary dividends of $357, taxable refunds of $927, and other income of $2,000, resulting in an adjusted gross income of $34,692. Petitioners reported Ms. Aldridge's pension distribution of $97,921 on line 16a, Total pensions and annuities, but claimed on line 16b that none of it was taxable. Petitioners claimed the standard deduction of $7,350 and exemptions of $8,400, resulting in taxable income of $18,942 and, after a child tax credit of $500, a total tax of $2,339.

Beginning with their 2001 return and through their 2004 return, petitioners timely filed joint federal income tax returns reporting zero wages for each of those years. In addition, each of the Aldridges began using Schedule C–EZ, Net Profit From Business, to report their purported business income as trustees. The returns reported their income, deductions, exemptions, and credits to zero out their taxable income in those years as follows:

|  | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Wages | – | – | – | – |
| Taxable interest | $333 | $187 | $67 | $58 |
| Ordinary dividends | 366 | 394 | 191 | 189 |
| Schedule C–EZ net profit–Mr. Aldridge | 1,800 | 1,150 | 2,500 | 3,100 |
| Schedule C–EZ net profit–Ms. Aldridge | 1,800 | 1,600 | 2,000 | 5,500 |

| [*12] Standard deduction | 7,600 | 7,850 | 9,500 | 9,700 |
|---|---|---|---|---|
| Exemptions | 8,700 | 9,000 | 9,150 | 9,300 |
| Taxable income | – | – | – | – |
| Earned income credit | 1,131 | 388 | 1,420 | 2,604 |

IX.    *Examination and Criminal Investigation*

A.    *Preliminary Examination and Criminal Investigation*

Respondent initially began examining petitioners' tax returns in April 2002 in connection with an investigation of National Trust Services. The revenue agent assigned to petitioners' case determined that petitioners had received a significant number of payments yet reported minimal income on their returns. Shortly thereafter, she referred the matter to the IRS Criminal Division.

The criminal investigation was initially assigned to Special Agent Amy Sanders. Special Agent Sanders interviewed petitioners at their home and issued summonses for bank records and other documents. Mr. Aldridge was misleading and evasive throughout the interview. He indicated that he was retired from Liberty Commerce Group Trust and that that trust had been dormant for six years, when in fact he was actively providing trust seminars and generating substantial revenue, which was regularly deposited in bank accounts titled to the trust. Liberty Commerce Group had also received Ms. Aldridge's Southwestern Bell pension as recently as 2000. When asked about the trustees of the Liberty Commerce Group Trust, Mr. Aldridge responded that they would have to talk with the trustees (i.e., himself and Ms. Aldridge) for permission to divulge who the trustees were.

Petitioners did not comply with the summonses, and the special agent overseeing petitioners' case submitted the case to a grand jury. Petitioners refused to cooperate with the subpoenas issued to them in the course of the grand jury investigation, insisting that they needed the permission of the trustees to comply. The parties reached an agreement to include the title "trustee" on the subpoenas for petitioners' cooperation. Even after reaching this compromise, petitioners still refused to comply and were arrested for contempt of court. Petitioners eventually complied with the subpoenas and provided the requested records.

**[\*13]**  Special Agent Jeffrey Trogden was assigned to petitioners' case in May 2004. In the course of his investigation, Special Agent Trogden conducted an extensive analysis of petitioners' business activity. He issued more than 50 subpoenas, interviewed over 400 witnesses, and analyzed 22 different bank accounts associated with petitioners and their trusts.

At the end of his comprehensive investigation, Special Agent Trogden concluded that petitioners had filed false tax returns for tax years 1998 through 2004[6] and recommended that the Department of Justice pursue prosecution. As described above, petitioners were ultimately convicted on five counts of filing false tax returns in violation of section 7206(1) and aiding and abetting the filing of false tax returns in violation of 18 U.S.C. § 2.

B.      *Bank Deposits Analysis*

In the course of his investigation, Special Agent Trogden conducted a review of 22 bank accounts, titled in the name of petitioners' trusts, over which petitioners had signature authority. Special Agent Trogden examined the bank account records for each trust, identified all of the deposits and subtracted out expenses, refunds, and nontaxable transfers from other accounts or other trusts, and concluded that the trusts received unreported business income as detailed below.

1.      *Liberty Commerce Group Trust*

During the years at issue, petitioners had signature authority over two bank accounts titled in the name of Liberty Commerce Group Trust. Special Agent Trogden analyzed the deposits, withdrawals, and transfers, and he concluded that Liberty Commerce Group Trust received business income and incurred expenses as follows:

---

[6] The charges in the indictment were limited to tax years 2000 through 2004 because the periods of limitations for criminal charges relating to the tax years 1998 and 1999 had expired by the time Special Agent Trogden completed his investigation.

| [*14] | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Gross Income | $363,129.54 | $281,369.66 | $498,373.00 | $479,217.00 | $346,553.00 | $395,371.00 |
| Total Expenses | 225,889.09 | 162,366.65 | 320,396.38 | 296,422.12 | 226,410.78 | 344,676.76 |
| Net Income | 137,240.45 | 119,003.00 | 177,976.62 | 182,794.88 | 120,142.22 | 50,694.24 |

In addition, Liberty Commerce Group Trust received dividends from Capitol Federal Financial of $30 in 1999, $46 in 2000, $62 in 2001, $200 in 2002, $200 in 2003, and $200 in 2004, and interest payments of $418.72 in 1999, $7,999.87 in 2000, $2,277.96 in 2001, $863.23 in 2002, $249.06 in 2003, and $244.58 in 2004.

### 2. *CMI Trust*

For tax years 1999 through 2003, Special Agent Trogden accepted the CMI Trust profit and expense information listed on the unfiled returns as substantially accurate. Those unfiled returns showed income as follows:

| | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| Gross Income | $630,054 | $862,338 | $1,990,643 | $3,105,883 | $2,836,896 |
| Total Expenses | 573,086 | 856,475 | 1,695,246 | 2,818,055 | 2,775,227 |
| Net Income | 56,968 | 5,863 | 295,397 | 287,828 | 61,669 |

For 2004, Special Agent Trogden examined the bank records of four bank accounts titled in the name of CMI Trust, over which petitioners had signature authority, and concluded that CMI Trust received gross receipts totaling $4,362,929.33 and paid business expenses totaling $4,251,373.32. After allowing for a depreciation deduction of $5,470, Special Agent Trogden concluded that CMI Trust's net business income for 2004 was $106,086.01.

### 3. *Lorbert Trust*

During the years at issue, petitioners had signature authority over two bank accounts attributable to the Lorbert Trust.[7] Special Agent

---

[7] Blue Ridge Bank and Trust account ending x0743 was titled in the name of the Lorbert Trust. UMB Bank account ending x1050 was titled in the name of Lorbert & Company. The Lorbert Trust conducted its business using both of these accounts.

[*15] Trogden examined the bank records and interviewed tenants in petitioners' rental properties. He concluded that the Lorbert Trust received rental income and incurred rental expenses (including depreciation) as follows:

|  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Rents Received | $6,058 | $6,404 | $6,224 | $6,221 | $6,022 | $5,403 |
| Expenses | 8,216 | 8,259 | 7,968 | 7,768 | 9,067 | 7,869 |
| Net Income | (2,158) | (1,855) | (1,744) | (1,547) | (3,045) | (2,466) |

### 4. *Alliance Financial Trust*

In December 2001 Ms. Aldridge filed Form 1041 for the Alliance Financial Trust's 2000 tax year, reporting ordinary income of $249.08 and interest income of $5,522.30. Special Agent Trogden reviewed the return and accepted the income and expenses reported thereon.

For the remaining tax years at issue, Special Agent Trogden examined the records of two bank accounts titled to Alliance Financial Trust, over which petitioners held signature authority, and a third account titled to Shirley Aldridge DBA Alliance Financial Trust, and he concluded that Alliance Financial Trust received business income of $1,029.01 in 2001 and $22.05 in 2002.

In addition, Alliance Financial Trust received interest payments of $98.29 in 2001, $53.20 in 2002, $26.65 in 2003, and $39.37 in 2004.

### C. *Subsequent Examination*

Following the criminal investigation, petitioners' civil examination was assigned to Revenue Agent Cindy Marshall. Revenue Agent Marshall reviewed the forensic accounting prepared by Special Agent Trogden and used those figures as a basis for the notice of deficiency. Determining that the income of the trusts was attributable to petitioners, Revenue Agent Marshall made the following adjustments, giving rise to the deficiencies set forth in the notice:

| [*16] | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Dividends | $30 | $46 | $62 | $200 | – | – |
| Interest Income | 465 | 13,610 | 2,479 | 1,055 | $757 | 988 |
| Sch C1–Net Business Income | 185,430 | – | – | – | – | – |
| SE AGI Adjustment | (6,949) | (8,563) | (15,922) | (17,098) | (13,132) | (10,851) |
| Itemized Deductions | 9,092 | (18,205) | (9,895) | (11,281) | (18,675) | (13,108) |
| Exemptions | 3,135 | 4,536 | 8,700 | 9,000 | – | – |
| Pensions and Annuities | – | 97,921 | – | – | – | – |
| Sch C2–Net Business Income–Shirley | – | 60,603 | 229,949 | 250,981 | 97,425 | 75,596 |
| Sch C1–Net Business Income–James | – | 60,604 | 229,949 | 251,431 | 96,926 | 77,997 |
| Standard Deduction | – | 7,350 | 7,600 | 7,850 | 9,500 | 9,700 |
| Qualified Dividends | – | – | – | – | 200 | 200 |
| Total Adjustments | 191,203 | 217,902 | 452,922 | 492,138 | 173,001 | 140,522 |

In addition, respondent determined civil fraud penalties under section 6663 of $54,672 for 1999, $69,668.25 for 2000, $132,989.25 for 2001, $142,854 for 2002, $46,707.75 for 2003, and $37,910.25 for 2004. Revenue Agent Marshall prepared a Civil Penalty Approval Form on May 21, 2009, and submitted the form to her immediate supervisor for signature. On May 22, 2009, Larry Akins, the immediate supervisor of Revenue Agent Marshall, signed the Civil Penalty Approval Form.

Respondent issued the notice of deficiency on March 31, 2010, and petitioners timely petitioned this Court for redetermination.

**[*17]**                              OPINION

I.      *Burden of Proof*

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayers bear the burden of proving that the determinations are in error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). When a case involves unreported income, the Commissioner must produce some evidence linking the taxpayer to an income-producing activity or establish some foundation or evidence supporting the assessment. *See Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). Once the Commissioner introduces substantive evidence linking the taxpayer to the income, the presumption of correctness applies and the burden shifts to the taxpayer to produce evidence overcoming it. *Id.* at 67–68.

In the notice of deficiency, respondent determined that petitioners received unreported business income from Liberty Commerce Group Trust, the CMI Trust, Lorbert Trust, and the Aldridge Family Trust. Respondent primarily argues that the trusts' income should be attributed to petitioners because the trusts were shams without economic substance.[8] Respondent has introduced bank statements of the various trusts and evidence of petitioners' business activities, as well as testimony and other evidence, linking petitioners to the unreported income determined in the notice. Accordingly, the burden is on petitioners to establish by a preponderance of the evidence that the determination is in error.

II.     *Unreported Income*

A.      *Overview of Subchapter J*

Ordinarily, the income tax treatment of trusts and their beneficiaries is governed by sections 641 through 668. Generally, trusts are taxed as separate entities. § 641(b). Trusts may deduct amounts distributed or required to be distributed to a beneficiary. §§ 651, 661.

---

[8] On brief respondent raises three alternative arguments as to why the income from the trusts is attributable to petitioners: (1) the trusts' income is taxable under the grantor trust provisions of sections 671 through 677; (2) the assignment of individual income to the trusts is not recognized for federal income tax purposes; or (3) petitioners' income should be increased pursuant to sections 652(a) and 662(a). Because the Court finds that the trusts were shams without economic substance, the Court does not address those alternative positions.

**[*18]** The beneficiary is taxed on amounts received from a trust during a year to the extent of the trust's distributable net income for that year. §§ 652, 662. Subject to certain qualifications not relevant here, distributable net income means a trust's taxable income. § 643(a). Therefore, a trust will have no tax liability, and it will exist solely as a conduit, if it distributes or is required to distribute all of its income. A trust is taxed at its own rates on accumulated income. § 641(a). Under the basic approach of subchapter J, the following tax consequences occur when a trust makes a distribution which includes some accumulated income: The beneficiary is taxed at his own rates up to the trust's distributable net income for the year of distribution, and the beneficiary is not taxed on amounts in excess of the trust's distributable net income. *See, e.g., Edward L. Stephenson Tr. v. Commissioner*, 81 T.C. 283, 289 (1983).

Petitioners argue, primarily, that the normal rules of subchapter J apply in this case and, accordingly, the deficiencies at issue are attributable to the respective trusts, and not to petitioners individually. Respondent disagrees. According to respondent, the trusts are shams that lack economic substance and should be disregarded for federal income tax purposes. Any income received by the trusts, respondent argues, is attributable to petitioners. As discussed below, the Court agrees with respondent.

B.      *Economic Substance*

Respondent argues that the six trusts making up the Aldridge Family Trust System were sham entities with no economic substance and should be disregarded for federal income tax purposes.

Taxpayers are generally free to structure their affairs to minimize taxes. *Gregory v. Helvering*, 293 U.S. 465 (1935). As a general rule, an arrangement will be treated as a trust under the Code where "the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, therefore, are not associates in a joint enterprise for the conduct of business of profit." Treas. Reg. § 301.7701-4; *see also Textron, Inc. & Sub. Cos. v. Commissioner*, 117 T.C. 67, 76 (2001). An arrangement, therefore, will be classified as a trust for federal income tax purposes if it is a bona fide transaction that involves a trustee, a beneficiary, and trust property. *See Bibby v. Commissioner*, 44 T.C. 638 (1965).

**[\*19]** A trust is disregarded for tax purposes, however, if in substance it lacks any valid purpose but is simply a tax-avoidance device. *Zmuda v. Commissioner*, 79 T.C. 714, 719–20 (1982), *aff'd*, 731 F.2d 1417 (9th Cir. 1984); *Markosian v. Commissioner*, 73 T.C. 1235, 1244–45 (1980); *Saccato v. Commissioner*, T.C. Memo. 2023-96, at \*8. Whether a trust lacks economic substance is a question of fact.[9] *Paulson v. Commissioner*, T.C. Memo. 1991-508, *aff'd per curiam*, 992 F.2d 789 (8th Cir. 1993).

In deciding whether to disregard a trust for federal income tax purposes, the Court considers four factors relating to the trust to determine whether a trust lacks economic substance: (1) whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation; (2) whether the trust has an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer feels bound by the restrictions imposed by the trust agreement or the law of trusts. *Markosian*, 73 T.C. at 1243–44; *Wegbreit v. Commissioner*, T.C. Memo. 2019-82, at \*52, *aff'd*, 21 F.4th 959 (7th Cir. 2021). If a trust lacks economic substance apart from tax considerations, the trust is a sham and is not recognized for federal tax purposes. *See Zmuda*, 79 T.C. at 720–22; *Markosian*, 73 T.C. at 1241; *Wegbreit*, T.C. Memo. 2019-82, at \*52. Consideration of each of these four factors supports a conclusion that the trusts constituting the Aldridge Family Trust System lack economic substance and are shams.

First, the relationship between petitioners and their property did not differ in any material respect following the creation of the trusts. Petitioners continued to reside in the same home, drive the same vehicles, wear the same clothing, and retain full unfettered access to all of their personal property. Petitioners paid their personal expenses out of the bank accounts titled to Liberty Commerce Group Trust, CMI Trust, the Aldridge Family Trust, and Lorbert Trust.

Petitioners' business activities did not change in any material sense following the creation of the trusts, either. When petitioners created CMI Trust, they and Mr. Rogers continued to operate the

[9] On brief petitioners argue that the trust system did indeed have economic substance because, petitioners allege, the arrangement had a substantial nontax purpose, as required under section 7701(o). Section 7701(o), which codified the economic substance doctrine, applies only to transactions entered into after March 30, 2010, and is therefore inapplicable to the present case. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1409(e)(1), 124 Stat. 1029, 1070.

[*20] business in the same manner as when it was organized as a corporation. They used the same business strategy, retained the same staff, and operated with the same bank account. Similarly, Lorbert Trust continued to operate in the same way before and after the creation of the trust.

Second, none of the trusts had an independent trustee. Petitioners, or entities they controlled, served as cotrustees of CMI Trust, the Liberty Commerce Group Trust, Excalibur Trust, Lorbert Trust, the Aldridge Family Trust, and Alliance Financial Trust during the years at issue. The trusts were operated in concert with one another, under the same administrative and management entity and with funds routinely transferred from one entity to another. There was no independent party who exercised any meaningful role in the operation of any of the trusts. Rather, petitioners controlled all aspects of the trusts during the years at issue.

Third, no economic interest passed to other beneficiaries. During the years at issue, the beneficiary of the Aldridge Family Trust was petitioners' minor child, while the beneficiary of the other trusts was the Aldridge Family Trust. In reality, however, little to no economic benefit passed to the beneficiaries. No return was filed by petitioners' minor child reporting income received from the trust, and the Aldridge Family Trust reported no income paid to him. Rather, the trusts were operated for the economic benefit of petitioners. Petitioners used the trusts' funds to pay the mortgage on their home, purchase motorcycles and other vehicles, and pay their personal expenses, including food, clothing, and vacations.

Finally, petitioners have not shown that they acted as though they were bound by the restrictions imposed by the trust agreement or the law of trusts. Although petitioners purported to observe certain trust formalities, such as by maintaining separate bank accounts, maintaining minutes of trust decisions, and insisting on signing trust-related documents with "T" next to their names, they disregarded their obligations as trustees in other, more substantive ways.

Although ostensibly trustees, petitioners did not take efforts to make the trust property productive. Rather than lease the trust property to generate income, petitioners maintained unrestricted access to trust property and complete control over how funds in the trust bank accounts were spent. The trusts allowed petitioners to continue to reside at the home purportedly owned by the Aldridge Family Trust, drive

**[\*21]** vehicles purportedly owned by the Excalibur Trust and rented to the Aldridge Family Trust, and use personal property owned by the Aldridge Family Trust, all without compensation. Petitioners introduced lease agreements between Excalibur Trust and the Aldridge Family Trust for the use of certain cars, a motorcycle, a boat, and trailers, and between Excalibur Trust and Liberty Commerce Group Trust for the use of the same vehicles. In both instances, however, the agreements do not specify any rent payments, and there is no evidence that any rent was ever paid.

Similarly, petitioners were not paid reasonable compensation for operating the trusts. Petitioners operated Liberty Commerce Group and CMI as their full-time jobs, yet they reported income from their work in trust administration ranging between $500 to $5,500 for the years at issue.

The Court therefore concludes that the trusts were shams, lacking in economic substance, and were mere alter egos of petitioners. Accordingly, the Court will disregard the trusts for federal tax purposes.[10] Petitioners are liable for federal income tax on the trusts' income for each of the years at issue. *See Zmuda*, 79 T.C. at 722 ("In substance, [the taxpayers] remained the owners of the property purportedly transferred . . . and accordingly are taxable on the income derived therefrom.").

### C.   *Business Income*

Gross income means all income from whatever source derived, including income derived from business. *See* § 61(a)(2). Gross income is construed broadly to include all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). Every person subject to income tax is required to maintain books and records sufficient to establish the amount of gross income and deductions shown by that

---

[10] Petitioners' argument that the Contract Clause of the U.S. Constitution requires respondent and this Court to give effect to their scheme is frivolous. *See* U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."). The Contract Clause, by its terms, applies only to the states and not to the federal government. *New York v. United States*, 257 U.S. 591, 601 (1922); *see also Benningfield v. Commissioner*, 81 T.C. 408, 420 (1983). In any event, the holding in this case does not impair the obligation of petitioners' contractual arrangements. The Contract Clause does not prohibit the United States from taxing a party or parties to a private contract. *Benningfield*, 81 T.C. at 420.

[*22] person on his or her income tax return. *See* § 6001; Treas. Reg. § 1.6001-1(a).

Bank deposits are prima facie evidence of income. *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986); *Bolles v. Commissioner*, T.C. Memo. 2019-42, at *14. The bank deposits method of proof assumes that all deposits into a taxpayer's bank account during a given period constitute taxable income unless the taxpayer can show that the deposits are nontaxable. *Clayton v. Commissioner*, 102 T.C. 632, 645 (1994). The Government must take into account any nontaxable source or deductible expense of which it has knowledge. *DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992).

With the exception of Alliance Financial Trust, which filed a return for 2000, none of the trusts in the Aldridge Family Trust System filed tax returns for any of the years at issue. Petitioners prepared, but did not file, tax returns for CMI Trust for 1999 through 2003. Special Agent Trogden accepted the Alliance Financial Trust tax return for 2000 and unfiled CMI Trust returns as substantially accurate. For the remaining trusts and tax years, Special Agent Trogden conducted bank deposits analyses of the bank accounts titled in the names of each of the trusts and concluded that, after taking into account transfers, funds from nontaxable sources, and deductible expenses, the trusts' combined net income was $185,930.14 in 1999, $121,206.68 in 2000, $463,497.94 in 2001, $505,162.27 in 2002, $198,851.22 in 2003, and $162,193 in 2004.[11]

Petitioners do not argue that respondent's use of the bank deposits analyses is erroneous or that any specific deposits included in respondent's determinations were from nontaxable sources. Rather, petitioners maintain only that the bank accounts at issue do not belong to them, as they are titled in the names of the various trusts within the Aldridge Family Trust System. As discussed *supra*, the Court has found that the trusts should be disregarded for federal income tax purposes

_____

[11] Special Agent Trogden's calculations are set forth in schedules 1.1 through 1.3 in the notice of deficiency. On Form 4549–A, Income Tax Discrepancy Adjustments, included with the notice, respondent determined the net income of the trusts to be $185,430 in 1999, $121,207 in 2000, $459,898 in 2001, $502,412 in 2002, $194,351 in 2003, and $153,593 in 2004. Respondent offers no explanations as to the discrepancies in the notice. Because the discrepancies favor petitioners, the Court concludes that respondent concedes the difference.

**[*23]** and that the income of the trusts is properly attributable to petitioners. Accordingly, respondent's adjustments are sustained.

D.   *Dividend Income*

Gross income includes dividends. § 61(a)(7). During the years at issue, Liberty Commerce Group Trust received dividend income from Capitol Federal Bank of $30, $46, $62, and $200 in 1999, 2000, 2001, and 2002, respectively.

Petitioners do not dispute that Liberty Commerce Group Trust received the dividends. The Court has found *supra* Part II.B that the trust lacks economic substance and that its income is attributable to petitioners. Accordingly, respondent's adjustments to petitioners' dividend income are sustained for all years.

E.   *Interest Income*

Gross income includes interest. § 61(a)(4). On the basis of bank statements and admissions on the Alliance Financial Group Trust 2000 tax return and the Liberty Commerce Group Trust unfiled tax returns for 1999 through 2003, respondent determined that petitioners received unreported interest income totaling $465 for 1999, $13,610 for 2000, $2,479 for 2001, $1,055 for 2002, $757 for 2003, and $988 for 2004.

Petitioners do not dispute that the trusts received the interest as set forth in the notice or allege that it was otherwise from a nontaxable source. Rather, they rely only on their argument that the trusts are separate entities and that they are not personally liable for the federal income tax on the trusts' income. The Court has found *supra* Part II.B that the Liberty Commerce Group Trust and Alliance Financial Trust lack economic substance and that their income is attributable to petitioners. Accordingly, respondent's adjustments to petitioners' interest income are sustained for all years.

F.   *Pension and Annuity Income*

Gross income includes pensions and distributions from a qualified retirement plan account, such as an individual retirement account (with exceptions not applicable here). *See* §§ 61(a)(9), (11), 72(a)(1), 408(d)(1). An exception exists if the distribution proceeds are rolled over into an eligible retirement plan or an IRA within 60 days of the distribution. *See* §§ 402(a), (c), 408(d)(1), (3). An eligible retirement plan means an individual retirement account described in section 408(a); an individual

**[*24]** retirement annuity described in section 408(b) (other than an endowment contract); a qualified trust; and an annuity plan described in section 403(a). *See* § 402(c)(8)(B).

Section 408(a) defines "individual retirement account" as a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the following requirements:

> (1) Except in the case of a rollover contribution described in subsection (d)(3), in section 402(c), 403(a)(4) or 403(b)(8), no contribution will be accepted unless it is in cash, and contributions will not be accepted for the taxable year in excess of $2,000 on behalf of any individual.
> (2) The trustee is a bank (as defined in subsection (n)) or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirements of this section.
> (3) No part of the trust funds will be invested in life insurance contracts.
> (4) The interest of an individual in the balance in his account is nonforfeitable.
> (5) The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund.
> (6) Under regulations prescribed by the Secretary, rules similar to the rules of section 401(a)(9) and the incidental death benefit requirements of section 401(a) shall apply to the distribution of the entire interest of an individual for whose benefit the trust is maintained.

In 2000 petitioners received a retirement distribution of $97,921 from Ms. Aldridge's Southwestern Bell Corporation Pension Plan and deposited those funds into a bank account titled in the name of Liberty Commerce Group Trust. Petitioners do not dispute that they received the distribution. Rather, they argue that the distribution is not included in gross income because Ms. Aldridge deposited the distributed funds into Liberty Commerce Group Trust's bank account, which, they contend, is an eligible retirement plan.

Petitioners have not offered any evidence to support their position that the Liberty Commerce Group Trust bank account into which the

**[\*25]** distributed funds were deposited meets the requirements of section 402(c)(8)(B) or 408(a). Indeed, the evidence shows that petitioners comingled the distributed funds with Liberty Commerce Group Trust sales revenue, in contravention of section 408(a)(5). Accordingly, respondent's adjustment is sustained.

III. *Disallowed Deductions*

On Schedule A of their 1999 return, petitioners claimed a deduction of $5,326 for taxes paid and a deduction of $9,862 for mortgage interest paid. With respect to the deduction for taxes paid, respondent disallowed $1,027 but moved a portion of that amount, $758, to petitioners' Schedule C income calculations as a home office expense.

Respondent disallowed $4,799 of the claimed mortgage interest deduction. The disallowed amount included $2,132 paid for one of petitioners' rental properties, which respondent allowed as an expense in calculating Lorbert Trust's net rental income. Respondent also allowed an additional home office expense of $2,937 attributable to mortgage interest in calculating petitioners' home office expense on Schedules C.

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they are entitled to any deduction claimed. *See* Rule 142(a); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Petitioners have not offered any evidence or argument to demonstrate that respondent's adjustments to their deductions are incorrect. Indeed, the majority of these adjustments were not disallowed but simply reallocated to other parts of petitioners' tax returns. *See, e.g.*, *Hairston v. Commissioner*, T.C. Memo. 1995-566, 1995 WL 699240, at \*5–6 (reallocating taxpayer's claimed mortgage expense deduction between Schedule A and office in the home deduction on the basis of percentage of business use). Respondent's adjustments are sustained.

IV. *Fraud*

A. *Section 6663(a) Penalties*

1. *Burden of Proof and Production*

Respondent determined that petitioners are liable for a fraud penalty pursuant to section 6663(a) for each of the years at issue. The Commissioner bears the burden of production with respect to any individual taxpayer's liability for any penalty imposed by the Code.

**[\*26]** § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). For section 6663 fraud penalties, the Commissioner must prove fraud by clear and convincing evidence. § 7454(a); Rule 142(b). Once such a showing is made, the burden shifts to the taxpayers to come forward with persuasive evidence that the determination is incorrect or that they acted with reasonable cause. *See Higbee*, 116 T.C. at 447.

One part of the Commissioner's burden of production is to show compliance with section 6751(b), which provides that "[n]o penalty . . . shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." *See also Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). An "initial determination" occurs the earlier of when the Commissioner issues a notice of deficiency or formally communicates a decision to determine penalties. *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 14–15 (2020); *Clay v. Commissioner*, 152 T.C. 223, 248–49 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).

Respondent produced a copy of the Civil Penalty Approval Form signed on May 22, 2009, by the immediate supervisor of Revenue Agent Marshall, who completed the civil examination of petitioners' returns after their criminal conviction, and approving the imposition of the fraud penalties. Respondent formally communicated his determination to assert the fraud penalties in the notice of deficiency, issued March 31, 2010. Petitioners do not claim, and the record does not support a conclusion, that respondent communicated his initial determination to petitioners before the date the examining agent's manager signed the Civil Penalty Approval Form. Accordingly, respondent has satisfied his burden with respect to section 6751(b).[12]

---

[12] Several circuits apply a different test for determining whether the Commissioner satisfies section 6751(b). *See Minemyer v. Commissioner*, No. 21-9006, 2023 WL 314832, at \*5 (10th Cir. Jan. 19, 2023) ("[T]he requirements of [section] 6751(b)(1) are met so long as written supervisory approval of an initial determination of an assessment is obtained on or before the date the IRS issues a notice of deficiency."), *aff'g in part, rev'g in part and remanding* T.C. Memo. 2020-99; *Kroner v. Commissioner*, 48 F.4th 1272, 1276–81 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73; *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1071–74 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020). The Eight Circuit, to which an appeal in this case would presumably lie, *see supra* note 3, has not squarely addressed the test for determining compliance with section 6751(b). The Court will, therefore, apply its own precedent on this issue. The Court notes, however, that under either test, respondent's burden is satisfied.

**[\*27]**       2.       *Fraud Penalties*

Section 6663(a) imposes a penalty equal to 75% of the taxpayer's underpayment of federal income tax that is due to fraud. Fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to be owing. *Petzoldt v. Commissioner*, 92 T.C. 661, 698 (1989); *Hacker v. Commissioner*, T.C. Memo. 2022-16, at \*32. If any portion of the underpayment is attributable to fraud, the entire underpayment will be treated as attributable to fraud unless the taxpayer establishes by a preponderance of the evidence that part of the underpayment is not due to fraud. § 6663(b); *see also Minchem Int'l, Inc. v. Commissioner*, T.C. Memo. 2015-56, at \*43–44, *aff'd sub nom. Sun v. Commissioner*, 880 F.3d 173 (5th Cir. 2018).

Respondent has the burden of proving fraud by clear and convincing evidence. *See* § 7454(a); Rule 142(b). To carry that burden of proof, respondent must show, for each year, that (1) an underpayment of tax exists and (2) some portion is attributable to the Aldridges' fraud. *See Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983); *Hacker*, T.C. Memo. 2022-16, at \*32. Fraud is a question of fact to be resolved upon consideration of the entire record. *DiLeo*, 96 T.C. at 874. Fraud is never presumed and must be established by independent evidence. *Minchem Int'l, Inc.*, T.C. Memo. 2015-56, at \*45.

Respondent has clearly and convincingly demonstrated for each year at issue that petitioners failed to report substantial income from various sources. The first element of the fraud penalty has been established.

The Court now turns to the second element of the fraud penalty and must determine whether petitioners had the requisite fraudulent intent. Because direct evidence of fraudulent intent is seldom available, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts. *Niedringhaus v. Commissioner*, 99 T.C. 202, 210 (1992); *Benavides & Co., P.C. v. Commissioner*, T.C. Memo. 2019-115, at \*34. The taxpayers' entire course of conduct may be indicative of fraudulent intent. *Niedringhaus*, 99 T.C. at 210.

Circumstances that may indicate fraudulent intent, commonly referred to as "badges of fraud," include but are not limited to (1) understating income; (2) maintaining inadequate records; (3) giving implausible or inconsistent explanations; (4) concealing income or assets; (5) failing to cooperate with authorities; (6) engaging in illegal

**[\*28]** activities; (7) providing incomplete or misleading information to one's tax return preparer; (8) lack of credibility of the taxpayer's testimony; (9) filing false documents, including false income tax returns; (10) failing to file tax returns; and (11) dealing in cash. *Minchem, Int'l, Inc.*, T.C. Memo. 2015-56, at \*46. No single factor is dispositive; however, the existence of several factors "is persuasive circumstantial evidence of fraud." *Vanover v. Commissioner*, T.C. Memo. 2012-79, 2012 WL 952871, at \*4.

Respondent argues that petitioners' fraudulent intent is demonstrated by the presence of a number of badges of fraud, including their long pattern of understating income; implausible and inconsistent explanations for their conduct; failure to cooperate with tax authorities; awareness of the federal tax laws during the years at issue; engagement in and conviction for illegal activities; criminal prosecution and conviction for federal tax crimes; concealment of income and assets; their knowledge and education level; and the maintenance of a lavish lifestyle.

The Court agrees. Petitioners' criminal convictions under section 7206(1) conclusively establish that they willfully understated their income for tax years 2000 through 2004, and there is clear and convincing evidence of an underpayment for each of the years at issue. Petitioners' pattern of understating their income during all six of the years at issue, as detailed *supra*, is strong evidence of fraud. Similarly, petitioners' failure to file returns for any of the trusts, with the exception of a single return for Alliance Financial Trust, for the years at issue, while receiving large sums of income, is further evidence of fraudulent intent. *See Petzoldt*, 92 T.C. at 701.

In addition, petitioners were uncooperative with tax authorities throughout the examination and criminal investigation. Mr. Aldridge consistently refused to answer questions or provide documents to respondent's revenue agents and special agents, claiming that he needed to receive permission from the board of trustees (i.e., himself and his wife). He misled authorities by claiming that Liberty Commerce Group Trust had been dormant for over six years at the time of the investigation and that he was living on his wife's income. Both petitioners refused to comply with subpoenas for trust records and were held in contempt for their refusal.

Petitioners are college educated. Both were fully aware of their obligations under the tax law and possessed the financial knowledge and

**[\*29]** business background to understand and comply with their obligations. Mr. Aldridge was successful in the real estate industry, as well as in sales and multilevel marketing, and held himself out as an expert in trusts and the taxation thereof. Ms. Aldridge previously held management positions at Southwestern Bell Corp. and handled bookkeeping for petitioners' businesses. Rather than comply with their tax obligations, however, they established a bogus trust arrangement in an effort to shield their substantial income and hide their assets, while filing false income tax returns, even going as far as claiming the earned income credit, a tax credit implemented to assist low-income taxpayers.

The evidence clearly and convincingly shows that petitioners possessed fraudulent intent with respect to their underpayment of tax for each of the years at issue. Respondent's determination of fraud penalties for the years at issue is sustained.

### B.  *Section 6501(c)(1) Period of Limitations*

Section 6501(a) generally requires the Commissioner to assess a tax within three years after the return was filed. If a taxpayer files a false or fraudulent return with the intent to evade tax, however, the tax may be assessed at any time. § 6501(c)(1). Respondent bears the burden of proving an exception to the general limitations period. *See Gould v. Commissioner*, 139 T.C. 418, 431 (2012), *aff'd*, 552 F. App'x 250 (4th Cir. 2014); *Harlan v. Commissioner*, 116 T.C. 31, 39 (2001). Respondent's burden of proof under section 6501(c)(1) is the same as his burden to prove applicability of the section 6663 civil fraud penalty. *Gould*, 139 T.C. at 431; *Browning v. Commissioner*, T.C. Memo. 2011-261, 2011 WL 5289636, at \*10. Because the Court sustained the application of the fraud penalties for all years at issue, the tax years remain open for the assessment of tax.

### V.  *Conclusion*

For the foregoing reasons, the Court sustains respondent's determination of deficiencies and fraud penalties for the years at issue. The Court has considered all arguments made in reaching its decision and, to the extent not mentioned herein, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*